of regular hours of employment, forty or $3.375). Notwithstanding the foregoing, if at any time such hourly wage rate is different for new hire and old hire Porters, then thereafter such hourly wage rate shall be based on the weighted average of the wage rates for the different classifications of Porters.

(ii)    "Base Wage Rate" shall mean the Wage Rate in effect on January 1, 2010.

(iii)    The term "Porters" shall mean that classification of non-supervisory employees employed in and about the Building who devote a major portion of their time to general cleaning, maintenance and miscellaneous services essentially of a non-technical and non-mechanical nature and are the type of employees who are presently included in the classification of "Class A-Others" in the Commercial Building Agreement between the Realty Advisory Board and the aforesaid Union.

(iv)    The term "minimum regular hourly rate of wages" shall not include any payments for fringe benefits or adjustments of any kind.

(v)    The term "Multiplication Factor" shall mean 4,750.

(b)    If the Wage Rate(s) for any calendar year during the term shall be increased above the Base Wage Rate, then Tenant shall pay, as additional rent, an amount equal to the product obtained by multiplying the Multiplication Factor by 100% of the number of cents (including any fraction of a cent) by which the Wage Rate(s) are greater than the Base Wage Rate, such payment to be made in equal one-twelfth (1/12th) monthly installments commencing with the first monthly installment of minimum rent falling due on or after the effective date of such increase in Wage Rate(s) (payable retroactive from said effective date) and continuing thereafter until a new adjustment shall have become effective in accordance with the provisions of this Article. Landlord shall give Tenant notice of each change in Wage Rate(s) which will be effective to create or change Tenant's obligation to pay additional rent pursuant to the provisions of this Section 22.02 and such notice shall contain Landlord's calculation in reasonable detail and certified as true by an authorized partner of Landlord or of its managing agent, of the annual rate of additional rent payable resulting from such increase in Wage Rate(s). Such amounts shall be prorated for any partial calendar years during the term.

37

(c)     Every notice given by Landlord pursuant to Section 22(b) hereof shall be conclusive and binding upon Tenant, except for manifest error.

(d)     Any delay or failure of Landlord in billing any Wage Rate escalation hereinabove provided shall not constitute a waiver of or in any way impair the continuing obligation of Tenant to pay such Wage Rate escalation.

(e)     The "Wage Rate" is intended to be a substitute comparative index of economic costs and does not necessarily reflect the actual costs of wages or other expenses of operating the Building.  The Wage Rate shall be used whether or not the Building is a Class A office building and whether or not Porters are employed in the Building and without regard to whether such employees are members of the Union referred to in subsection (a) hereof.

## ARTICLE 23

### Electric Inclusion

Section 23.01.

(a)     Landlord shall furnish electric energy on a rent inclusion basis to the Demised Premises, the charges therefor being included in the minimum rent.  The amount included in the minimum rent is based upon the normal use of such electric energy between the hours of 9:00 A.M. to 5:30 P.M. on Mondays through Fridays, Saturdays, Sundays and holidays excepted, for lighting and for the normal use of lamps, word processors, office copying machines, typewriters, personal computers and similar customary office machines (excluding any supplemental air conditioning). Landlord shall not be liable in any way for any loss, damage or expense that Tenant may sustain or incur by reason of any failure, change, interruption or defect in the supply or character of electric energy furnished to the Demised Premises by reason of any requirement, act or omission of the Electric Service Provider or Alternate Service Provider (as said terms are hereinafter defined) serving the Building with electricity and no such failure, change, interruption or defect shall constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement of minimum rent or additional rent or relieve Tenant of its obligations under this Lease.  Tenant shall furnish and install, at its sole cost and expense, all lighting fixtures, tubes, lamps, bulbs, ballasts and outlets relating to Tenant's electrical equipment.

(b)     Landlord has advised Tenant that presently Con Edison ("Electric Service Provider") is the utility company selected by Landlord to provide electricity service for the Building. Notwithstanding the foregoing, if permitted by law, Landlord shall have the right at any time and from time to time during the term of this Lease to either contract for service from a different company or companies providing electricity service (each such company shall hereinafter be referred to as an "Alternate Service Provider") or continue to contract for service from the Electric Service Provider.

(c)     Tenant shall cooperate with Landlord, the Electric Service Provider, and any Alternate Service Provider at all times and, as reasonably necessary, shall allow Landlord, Electric Service Provider, and any Alternate Service Provider reasonable access to the Building's electric lines, feeders, risers, wiring, and any other machinery within the Demised Premises.

Section 23.02.     Tenant's connected electrical load in the Demised Premises, including lighting, shall not at any time exceed the capacity of any of the electrical conductors and equipment in or serving the Demised Premises. In order to insure that such capacity is not exceeded and to avert possible adverse effect upon the Building electric service, Tenant shall not, without Landlord's prior consent in each instance, connect any additional fixtures, appliances or equipment (other than as set forth in Section 23.01) or make any alteration or addition to the electric system of the Demised Premises existing on the Commencement Date. Should Landlord grant such consent, all additional risers or other equipment required therefor shall be provided by Landlord and the cost thereof shall be paid by Tenant upon Landlord's demand. As a condition to granting such consent, Landlord may require Tenant to agree to an increase in the annual minimum rent by an amount which will reflect the value to Tenant of the additional service to be furnished by Landlord, that is the potential additional electrical energy to be made available to Tenant based upon the estimated additional capacity of such additional risers or other equipment. If Landlord and Tenant cannot agree thereon, the amount of such increase shall be determined by a reputable, independent electrical engineer or consultant, to be selected by Landlord whose fees or charges shall be paid by Tenant. When the amount of such increase is so determined, Tenant shall pay to Landlord within twenty (20) days following notification to Tenant of such determination the amount thereof retroactive to the date of such increased usage, unless within such twenty (20) day period Tenant disputes such determination. If Tenant disputes such determination, it shall, at its own expense, obtain from a reputable, independent electrical engineer or consultant, its own survey of the additional electrical energy consumed by Tenant. Tenant's consultant and Landlord's consultant shall then seek to agree on a finding of such determination of such change in the consumption of electrical energy. If they cannot agree, they shall choose a third reputable, independent electrical engineer or consultant, whose cost shall be shared equally by Landlord and Tenant, to make a similar survey, and the determination of such third consultant shall be controlling. If they cannot agree on such third consultant, within ten (10) days, then either party may apply to the Supreme Court in the County of New York, for the appointment of such third consultant. However, pending such determination,

39

Tenant shall pay to Landlord the amount as determined by Landlord's engineer or consultant. If the amount determined as aforesaid is different from that determined by Landlord's engineer or consultant, then Landlord and Tenant shall make adjustment for any deficiency owed by Tenant or overage paid by Tenant. Following the final determination, the parties shall execute an agreement supplementary hereto to reflect such increase in the annual minimum rent and in the amount set forth in Section 23.03; but such increase shall be effective even if such supplementary agreement is not executed.

Section 23.03.    If, during the term of this Lease, the public utility rate paid by Landlord for the supply of electric current to the Building shall be increased or if there shall be an increase in taxes or if additional taxes shall be imposed upon the sale or furnishing of such electric energy (hereafter collectively as the "cost") the annual minimum rent shall be increased by an amount arrived at by multiplying $16,625.00 (or the sum to which said sum may have been increased pursuant to the provisions of Section 23.02 or this Section 23.03 prior to the effective date of the cost increases; such sum being referred to herein as the "Rent Inclusion Factor") by the percentage of the increase of such cost. When the amount of such increase is so determined, Landlord and Tenant shall execute an agreement supplementary hereto to reflect such increase in the amount of the minimum rent payable and effective from the effective date of such increase, but such increase shall be effective from such date whether or not such a supplementary agreement is executed.

Section 23.04.    Landlord reserves the right to discontinue furnishing electric energy at any time, whether or not Tenant is in default under this Lease, upon not less than thirty (30) days' notice to Tenant. If Landlord exercises such right of discontinuance, this Lease shall continue in full force and effect and shall be unaffected thereby, except only that, from and after the effective date of such discontinuance, Landlord shall not be obligated to furnish electric energy to Tenant, and the minimum rent payable under this Lease shall be reduced by an amount per annum equal to the then prevailing Rent Inclusion Factor. If Landlord so elects to discontinue furnishing electric energy to Tenant, Tenant shall arrange to obtain electric energy directly from the Electric Service Provider furnishing electric service to the Building or the Alternate Service Provider. Notwithstanding the foregoing, Landlord shall not discontinue furnishing electric energy until Tenant is able to obtain such electric energy directly from said Electric Service Provider or the Alternate Service Provider. Such electric energy may be furnished to Tenant by means of the then existing Building system feeders, risers and wiring, to the extent the same are available, suitable, and safe for such purposes, all of which shall be maintained in good order and condition at the expense of Landlord, except if damaged due to the negligence or willful misconduct of Tenant, its agents, contractors or employees. All meters and additional panel boards, feeders, risers, wiring and other conductors and equipment which may be required to obtain electric energy directly from such public utility company, and which are to be located within the Demised Premises, shall be installed and maintained by Tenant at its expense.

Section 23.05.    At no time shall Tenant's connected electrical load in the Demised Premises, including lighting, exceed five (5) watts per usable square foot.

## ARTICLE 24

### Broker

Landlord and Tenant covenant and represent that the sole brokers who negotiated and brought about this transaction were CB Richard Ellis Real Estate Services, Inc. and Cohen Brothers Realty Corporation and Landlord agrees to pay a commission therefor as per separate agreements. Landlord and Tenant agree to hold the other harmless against any claims for a brokerage commission arising out of a breach by the indemnifying party of the representations contained in this Article.

## ARTICLE 25

### Subordination and Ground Lease

Section 25.01.        This Lease is subject and subordinate to (a) the ground and underlying lease, dated as of May 1, 1967 between Southern Associates, Inc., as landlord, and Sherman Cohen, Mortimer H. Cohen and Edward B. Cohen, as tenant, (the "Ground Lease") a memorandum of which was recorded in the Office of the City Register, New York County, in Reel 181, Page 194 and to the rights of the landlord thereunder (the landlord under said Ground Lease being sometimes referred to in this Lease as the "Overlandlord"), (b) any other future ground and underlying lease, and (c) to all mortgages which may now or hereafter affect any such ground and underlying lease or the Building, and to all renewals, modifications, amendments, consolidations, replacements or extensions of any of the foregoing. This clause shall be self-operative and no further instrument of subordination shall be required. However, in confirmation of such subordination, Tenant, at any time and from time to time, shall execute promptly any certificate and document that Landlord may request, which reasonably evidences such subordination, and Tenant hereby irrevocably constitutes and appoints Landlord attorney-in-fact for Tenant to execute any such instrument for and on behalf of Tenant if not so executed and delivered by Tenant within fifteen (15) days after such request.

Section 25.02.

(a)        Tenant covenants and agrees that if by reason of a default under any ground or underlying lease (including an underlying lease through which the Landlord derives its leasehold estate in the Demised Premises), or under the leasehold mortgage or any mortgage (collectively the "Mortgage") encumbering the leasehold or fee estate of Landlord in the Demised Premises, such ground or underlying lease and the leasehold or fee estate of the Landlord in the premises demised hereby is terminated (whether by foreclosure or otherwise), Tenant will attorn to the then holder of the reversionary interest in such underlying lease or the then holder of such Mortgage, (the "Holder") encumbering the premises demised by this Lease

41

and will recognize such Holder as Tenant's Landlord under this Lease, unless the Holder shall, in any proceeding to terminate such ground or underlying lease or foreclosure of such Mortgage, elect to terminate this Lease and the rights of Tenant hereunder; provided, however, in the event the Holder accepts such attornment, the Holder shall not be: (i) liable for any act or omission or negligence of Landlord under this Lease; (ii) subject to any counterclaim, defense or offset, which theretofore shall have accrued to Tenant against Landlord; (iii) obligated to perform any alteration, improvement or other work; (iv) bound by any previous modification or amendment of this Lease or by any previous prepayment of more than one months' rent, unless such modification or prepayment shall have been approved in writing by the Holder; (v) obligated to repair the Demised Premises, or the Building, or any part thereof, in the event of any damage beyond such repair as can reasonably be accomplished from the net proceeds of insurance actually made available to the Holder; or (vi) obligated to repair the Demised Premises or the Building, or any part thereof, in the event of partial condemnation beyond such repair as can reasonably be accomplished from the net proceeds of any award actually made available to the Holder; (vii) responsible for any monies owed by Landlord to Tenant unless actually received by the Holder; or (viii) bound by any obligation to make any payment to Tenant with respect to construction of the Demised Premises. Tenant agrees to execute and deliver, at any time and from time to time, within fifteen (15) days after the request of any instrument which may be necessary or appropriate to evidence such attornment, and Tenant hereby irrevocably constitutes and appoints Landlord attorney-in-fact for Tenant to execute any such instrument for and on behalf of Tenant, if not so executed and delivered within such fifteen (15) day period. Tenant further waives the provisions of any statute or rule or law now or hereafter in effect which may give or purport to give Tenant any right of election to terminate this Lease or to surrender possession of the premises demised hereby in the event any proceeding is brought by the Holder to terminate the same, and agrees that unless and until any such Holder, in connection with any such proceeding, shall elect to terminate this Lease and the rights of Tenant hereunder, this Lease shall not be affected in any way whatsoever by any such proceeding.

(b)     Upon its receipt of a written notice from the Holder to the effect that the Tenant should pay the minimum rent and additional rent thereafter due and payable under this Lease to said Holder at a place designated in such notice, Tenant shall pay such minimum rent and additional rent to said Holder at such designated place until such time as said Holder shall notify Tenant that Landlord is no longer in default under said ground or underlying lease or said Mortgage and that Tenant may resume paying all minimum rent and additional rent thereafter due and payable under this Lease to Landlord.  Tenant shall have no liability to Landlord for paying any minimum rent or additional rent to said Holder or

42

otherwise acting in accordance with the provisions of any notice sent to it under this paragraph and shall be relieved of its obligations to pay Landlord any minimum rent or additional rent under this Lease to the extent such payments are made to said Holder.

Section 25.03.      In the event of any act or omission by Landlord which would give Tenant the right to terminate this Lease or to claim a partial or total eviction, pursuant to the terms of this Lease, Tenant will not exercise any such right until:

(a)     it has given written notice of such act or omission to the Holder whose names and addresses shall previously have been furnished to Tenant in accordance with Article 31, addressed to such Holder at the last addresses so furnished, and

(b)     a reasonable period (not to exceed the period in the ground lease or the Mortgage, as the case may be) for remedying such act or omission shall have elapsed following such giving of notice during which such parties, or any of them, with reasonable diligence, following the giving of such notice, shall not have commenced and is or are not continuing to remedy such act or omission or to cause the same to be remedied.

Section 25.04.      If, in connection with obtaining financing for the Building, or of Landlord's interest in any ground or underlying lease, a banking, insurance or other recognized institutional lender shall request modifications in this Lease as a condition to such financing, Tenant will not unreasonably withhold, delay or defer its consent thereto and its execution and delivery of such modification agreement, provided that such modifications do not increase the obligations of Tenant hereunder or adversely affect the leasehold interest hereby created, in either case beyond a de minimus extent.

## ARTICLE 26

### Estoppel Certificate

Tenant shall at any time, and from time to time, within ten (10) days after so requested by Landlord, execute, acknowledge and deliver to Landlord, a statement addressed to Landlord or its designee stating (a) that this Lease is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications), (b) stating the dates to which the minimum rent and additional rent have been paid, (c) stating whether or not there exists any default by Landlord, and, if so, specifying each such default, and (d) such other information requested by Landlord or the Mortgagee, it being intended that any such statement may be relied upon by Landlord and parties with whom it may be dealing, including any mortgagee or prospective mortgagee of any mortgage affecting the Building or the leasehold estate under any ground or underlying lease affecting the land described in Schedule B and/or Building and improvements thereon, or may be relied upon by the

43

landlord under any such ground or underlying lease or a purchaser of Lessee's estate under any such ground or underlying lease or any interest therein.

## ARTICLE 27

### Waiver of Jury Trial

Tenant hereby waives trial by jury in any proceeding, action or counterclaim that may hereafter be instituted against it on any matter whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord or Tenant, Tenant's use or occupancy of the Demised Premises, including any claims for injury or damage, or any emergency or other statutory remedy with respect thereto.

## ARTICLE 28

### Surrender of Premises

Section 28.01.      Upon the expiration or other termination of the term of this Lease, Tenant shall quit and surrender the Demised Premises in good order and condition, ordinary wear and tear and damage by the elements, fire or other casualty or any other cause for which Tenant might not be liable excepted, and shall remove all its property therefrom, except as otherwise provided in this Lease. Tenant's obligation to observe or perform this covenant shall survive the expiration or other termination of the term of this Lease.

Section 28.02.      In the event Tenant shall remain in possession of the Demised Premises after the expiration or other termination of the term of this Lease, such holding over shall not constitute a renewal or extension of this Lease. Landlord, may, at its option, elect to treat Tenant as one who is not removed at the end of the term, and thereupon be entitled to all of the remedies against Tenant provided by law in that situation or Landlord may elect to construe such holding over as a tenancy from month-to-month, subject to all of the terms and conditions of this Lease, except as to the duration thereof, and the minimum rent shall be due, in either of such events, at a monthly rental rate equal to one and one-half (1½) times the monthly installment of minimum rent which would otherwise be payable for such month for the first (1st) month and thereafter two (2) times the monthly installment of minimum rent, together with any and all additional rent. If the Demised Premises are not surrendered upon the termination of this Lease, Tenant shall indemnify Landlord against liability resulting from such delay by Tenant, including any claims made by any succeeding tenant founded upon such delay.

## ARTICLE 29

### Rules and Regulations

Section 29.01.      Tenant, its servants, employees, agents, visitors and licensees shall observe faithfully and comply with the rules and regulations set forth in Schedule "D" attached hereto and made a part hereof.  Landlord shall have the right from time to time during the term of this Lease to make reasonable changes in and additions to the rules thus set forth.

Section 29.02.      Any failure by Landlord to enforce any rules and regulations now or hereafter in effect, either against Tenant or any other tenant in the Building, shall not constitute a breach hereunder or waiver of any such rules and regulations.

## ARTICLE 30

### Successors and Assigns and Definitions

Section 30.01.      The covenants, conditions and agreements contained in this Lease shall bind and enure to the benefit of Landlord and Tenant and their respective distributees, legal representatives, successors and, except as otherwise provided herein, their assigns.

Section 30.02.      The term "Landlord" as used in this Lease, so far as the covenants and agreements on the part of Landlord are concerned shall be limited to mean and include only the owner or owners at the time in question of the tenant's estate under the Ground Lease or under any ground or underlying lease covering the land described in Schedule C hereto annexed and/or the Building and improvements thereon.  In the event of any assignment or assignments of such tenant's estate, and regardless of whether the assignee is financially responsible or solvent and not notwithstanding that the assignor may be a stockholder, officer or director of a corporate assignee or may be associated directly or indirectly with the assignee, Landlord herein named (and in case of any subsequent assignment, the then assignor) shall be automatically freed and relieved from and after the date of such assignment of all personal liability as respects to performance of any of Landlord's covenants and agreements thereafter to be performed, and such assignee shall, by acceptance of such assignment, be bound by all of such covenants and agreements; it being intended that Landlord's covenants and agreements shall be binding on Landlord, its successors and assigns only during and in respect of their successive periods of such ownership.  Notwithstanding the foregoing, Landlord shall not be relieved of any liability with respect to any security deposited with and held by Landlord until said security is transferred to such assignee.

45

However, in any event, Landlord shall not have any personal liability or obligation by reason of any default by Landlord under any of Landlord's covenants and agreements in this Lease, and in case of such default, Tenant will look only to Landlord's estate, as tenant under the Ground Lease or under any ground or underlying lease, covering the land described in Schedule B, to recover any loss or damage resulting therefrom; and Tenant shall have no right to nor shall Tenant assert any claim against nor have recourse to Landlord's other property or assets to recover such loss or damage.

Section 30.03.    All pronouns or any variation thereof shall be deemed to refer to masculine, feminine or neuter, singular or plural as the identity of the person or persons may require; and if Tenant shall consist of more than one (1) person, the obligations of such persons, as Tenant, under this Lease, shall be joint and several.

Section 30.04.    The definitions contained in Schedule F annexed hereto are hereby made a part of this Lease.


# ARTICLE 31

## Notices

Any notice, statement, certificate, request, approval, consent or demand required or permitted to be given under this Lease shall be in writing sent by registered or certified mail (or reputable, commercial overnight courier service), return receipt requested and postage prepaid, addressed, as the case may be, to Landlord, at 750 Lexington Avenue, New York, New York 10022, and to Tenant, prior to the Commencement Date at 909 Nottingham Road, Wilmington, Delaware 19805, and after the Commencement Date, at the Demised Premises, or to such other addresses as Landlord or Tenant respectively shall designate in the manner herein provided. Such notice, statement, certificate, request, approval, consent or demand shall be deemed to have been given two (2) days after the date of mailing, as aforesaid, or on the date of delivery (or refusal to accept delivery) by overnight courier.


# ARTICLE 32

## No Waiver; Entire Agreement

Section 32.01.    The specific remedies to which Landlord may resort under the provisions of this Lease are cumulative and are not intended to be exclusive of any other remedies or means of redress to which Landlord may be lawfully entitled in case of any breach or threatened breach by Tenant of any of the terms, covenants and conditions of this Lease. The failure of Landlord to insist upon the strict performance of any of the terms, covenants and conditions of this Lease, or to exercise any right or remedy herein contained, shall not be construed as a waiver or relinquishment for the future of such term, covenant, condition, right or remedy. A receipt by Landlord of

minimum rent or additional rent with knowledge of the breach of any term, covenant or condition of this Lease shall not be deemed a waiver of such breach. This Lease may not be changed or terminated orally. In addition to the other remedies in this Lease provided, Landlord shall be entitled to seek restraint by injunction of the violation or attempted or threatened violation of any of the terms, covenants and conditions of this Lease or to a decree, any court having jurisdiction in the matter, compelling performance of any such terms, covenants and conditions.

Section 32.02.    No receipt of monies by Landlord from Tenant, after any re-entry or after the cancellation or termination of this Lease in any lawful manner, shall reinstate the Lease; and after the service of notice to terminate this Lease, or after commencement of any action, proceeding or other remedy, Landlord may demand, receive and collect any monies due, and apply them on account of Tenant's obligations under this Lease but without in any respect affecting such notice, action, proceeding or remedy, except that if a money judgment is being sought in any such action or proceeding, the amount of such judgment shall be reduced by such payment.

Section 32.03.    If Tenant is in arrears in the payment of minimum rent or additional rent, Tenant waives its right, if any, to designate the items in arrears against which any payments made by Tenant are to be credited and Landlord may apply any of such payments to any such items in arrears as Landlord, in its sole discretion, shall determine, irrespective of any designation or request by Tenant as to the items against which any such payments shall be credited.

Section 32.04.    No payment by Tenant nor receipt by Landlord of a lesser amount than may be required to be paid hereunder shall be deemed to be other than on account of any such payment, nor shall any endorsement or statement on any check or any letter accompanying any check tendered as payment be deemed an accord and satisfaction and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such payment due or pursue any other remedy in this Lease provided.

Section 32.05.    This Lease and the Schedules annexed hereto constitute the entire agreement between Landlord and Tenant relating to the Demised Premises, and all prior negotiations and agreements are merged herein.

Section 32.06.    If any term or provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

Section 32.07.    Tenant acknowledges that Landlord will contract or has contracted with one or more providers of telecommunications services for the installation of cable, wire and related electrical, electronic or mechanical devices in the Building sufficient

47

to provide telecommunications services to the Demised Premises, and Tenant agrees to engage such a provider, as designated by Landlord, to provide such services, unless another provider selected by Tenant and approved by Landlord agrees to provide such services to Tenant at a lower cost than the provider designated by Landlord. In such event Landlord shall have the right to cause the service provider designated by Landlord to match the cost chargeable by the provider selected by Tenant, in which event Tenant agrees to engage the provider designated by Landlord.

Section 32.08.    It is understood and agreed that this Lease is submitted to Tenant on the understanding that it shall not be considered an offer and shall not bind Landlord in any way whatsoever until (i) Tenant has duly executed and delivered duplicate originals to Landlord, and (ii) Landlord has executed and delivered one of said fully executed originals to Tenant.

Section 32.09.    In consideration of the mutual benefits arising under this Lease, Tenant hereby grants to Landlord a lien and security interest on all property of Tenant now or hereafter placed in or upon the Demised Premises, and such property shall be and remains subject to such lien and security interest of Landlord for payment of all rent, and to secure payment of any damage or loss which Landlord may suffer by reason of the breach by Tenant of any covenant, agreement or condition contained herein.  The provisions of this section relating to said lien and security interest shall constitute a security agreement under the New York Uniform Commercial Code "the Code") so that Landlord shall have and may enforce a security interest on all property of Tenant now or hereafter placed in or on the Demised Premises, including but not limited to all Trade Fixtures, and all goods, wares, fixtures, equipment, furniture, and other articles of personal property now or hereafter placed in or upon the Demised Premises by Tenant, and all proceeds therefrom, and such property shall not be removed therefrom without the  consent of Landlord until all arrearages in rent then due to Landlord hereunder shall first have been paid and discharged and all the covenants, agreements and conditions hereof have been fully complied with and performed by Tenant.  Upon the occurrence of an event of default, Landlord may, in addition to any other remedies provided herein or under law, enter upon the Demised Premises and take possession of any Trade fixtures and all goods wares, equipment, fixtures, furniture, improvements and other personal property of Tenant situated in the Demised Premises, without liability for trespass or conversion, and sell the same at public or private sale with or without having such property at the sale, after giving Tenant reasonable notice of the time of any public sale or of the time after which any private sale is to be made, at which sale Landlord or its assigns may purchase unless otherwise prohibited by law.  Unless otherwise provided by applicable law, and without intending to exclude any other manner of giving Tenant reasonable notice, the requirement of reasonable notice shall be met if such notice is given in the manner prescribed in this Lease at least five (5) days before the time of sale.  The proceeds from any such disposition, less any and all expenses connected with the taking of possession, holding and selling of the property (including attorney's fees and other expenses), shall be applied as a credit against the indebtedness secured by the security interest granted herein.  In the event the proceeds from any such disposition exceed the indebtedness secured by the security interest granted herein, then such surplus shall be paid as required by law. Tenant

48

agrees to execute as debtor such financing statement or statements as Landlord may now or hereafter reasonably request in order that such security interest or interests may be perfected pursuant to said Code. Landlord, as secured party, shall be entitled to all of the rights and remedies afforded a secured party under said Code, in addition to and cumulative of the Landlord's liens and rights provided by law or by the other terms and provisions of this Lease.

Section 32.10.     Should Tenant consist of two or more persons or entities, then each person or entity signing below as Tenant shall be jointly and severally liable for all of Tenant's obligations under this Lease.

Section 32.11     This Lease may be executed in counterparts, each of which shall be deemed to be an original.

## ARTICLE 33

### Captions

The captions of Articles in this Lease are inserted only as a matter of convenience and for reference and they in no way define, limit or describe the scope of this Lease or the intent of any provision hereof.

## ARTICLE 34

### Inability to Perform

Tenant's obligation to pay minimum rent and additional rent and to perform all of the other terms, covenants and conditions of this Lease shall not be affected, diminished, or excused if, by reason of unavoidable delays (as hereinafter defined), Landlord fails or is unable to supply any services or make any repairs or perform any work which under this Lease Landlord has expressly agreed to supply, make or perform, and the time for the performance or observance thereof shall be extended for the period of time as Landlord shall have been so delayed.

The words "unavoidable delays", as used in this Lease shall mean (a) the enactment of any law or issuance of any governmental order, rule or regulation (i) prohibiting or restricting performance of work of the character required to be performed by Landlord under this Lease, or (ii) establishing rationing or priorities in the use of materials, or (iii) restricting the use of labor, and (b) strikes, lockouts, acts of God, inability to obtain labor or materials, enemy action, civil commotion, fire, unavoidable casualty or other similar types of causes beyond the reasonable control of Landlord, other than financial inability.

## ARTICLE 35

### No Representations by Landlord

Neither Landlord nor any agent or employee of Landlord has made any representation whatsoever with respect to the Demised Premises except as expressly set forth in this Lease.

## ARTICLE 36

### Late Payment Charges

If Tenant shall fail to pay any minimum rent or additional rent within ten (10) days after its due date, Tenant shall pay a late charge of $.05 for each $1.00 which remains unpaid after such period to compensate Landlord for additional expense in processing such late payment. In addition, if Tenant fails to pay any minimum rent or additional rent within fifteen (15) days after its due date, Tenant shall pay interest thereon from the date due until the date paid at the rate of one and one-half percent (1 2%), per month. If any check of Tenant in payment of any sum due under this Lease, including but not limited to minimum rent and additional rent, fails to clear the bank, Tenant shall pay a charge of $100.00.

## ARTICLE 37

### Rent Control

In the event the minimum rent and/or additional rent or any part thereof provided to be paid by Tenant under the provisions of this Lease during the demised term shall become uncollectible or shall be reduced or required to be reduced or refunded by virtue of any federal, state, county or city law, order or regulation, or by any direction of a public officer or body pursuant to law, or the orders, rules, code or regulations of any organization or entity formed pursuant to law, Tenant shall enter into such agreement(s) and take such other steps (without additional expense or liability to Tenant) as Landlord may reasonably request and as may be legally permissible to permit Landlord to collect the maximum rents which from time to time during the continuance of such legal rent restriction may be legally permissible (and not in excess of the amounts reserved under this Lease). Upon the termination of such legal rent restriction, (a) the minimum rent and/or additional rent shall become and thereafter be payable in accordance with the amounts reserved herein for the periods following such termination, and (b) Tenant shall pay to Landlord promptly upon being billed, to the maximum extent legally permissible, an amount equal to (i) minimum rent and/or additional rent which would have been paid pursuant to this Lease but for such legal rent restriction less (ii) the rents paid by Tenant during the period such legal rent restriction was in effect.

# ARTICLE 38

## Security Deposit

Section 38.01.     Concurrently with the execution of this Lease, Tenant shall deposit with Landlord the sum of $50,470, by Letter of Credit as provided in Section 38.02, as security for the faithful performance and observance by Tenant of the terms, provisions and conditions of this Lease. Tenant agrees that, in the event that Tenant defaults, after any applicable notice and expiration of any applicable cure period, in respect of any of the terms, provisions and conditions of this Lease (including the payment of minimum rent and additional rent), Landlord may notify the "Issuing Bank" (as such term is defined in Section 38.02) and thereupon receive all of the monies represented by the said Letter of Credit and use, apply, or retain the whole or any part of such proceeds to the extent required for the payment of any rent, additional rent, or any other sum as to which Tenant is in default, or for any sum that Landlord may expend or may be required to expend by reason of Tenant's default, in respect of any of the terms, covenants and conditions of this Lease (including any damages or deficiency accrued before or after summary proceedings or other re-entry by Landlord). In the event that Landlord applies or retains any portion or all of the proceeds of such Letter of Credit, Tenant shall forthwith restore the amount so applied or retained so that, at all times, the amount deposited shall be $50,470. Upon Tenant making such additional deposit, Landlord is hereby authorized to act as Tenant's agent to use the proceeds of the Letter of Credit to obtain a new Letter of Credit and Tenant hereby irrevocably appoints Landlord as Tenant's agent and attorney-in-fact to obtain a replacement Letter of Credit from the Issuing Bank or any such qualifying back (such qualifying bank shall then be the Issuing Bank). If Tenant shall fail or refuse to make such additional deposit, Landlord shall have the same rights in law and in equity and under this Lease as it has with respect to a default by Tenant in the payment of minimum rent.   In the event that Tenant shall fully and faithfully comply with all of the terms, provisions, covenants and conditions of this Lease, the Letter of Credit shall be returned to Tenant after the expiration date and after delivery of possession of the entire Demised Premises to Landlord in the condition provided in this Lease for such delivery of possession.

Section 38.02.     Such letter of credit (the "Letter of Credit") shall be a clean, irrevocable and unconditional Letter of Credit (the "Letter of Credit") issued by and drawn upon any commercial bank (the "Issuing Bank") with offices for banking purposes in the City of New York or in Delaware, and having at all times that such Letter of Credit is in effect having combined capital and surplus of not less than $1,000,000,000, which Letter of Credit shall have an initial term of not less than one year or thereafter having a term expiring not less than ninety (90) days following the expiration of the term of this Lease, shall permit multiple drawings, shall be transferable by the beneficiary on one or more occasions at no charge to the beneficiary, and otherwise be in form and content satisfactory to Landlord, be for the account of Landlord and be in the amount of $50,470. Notwithstanding the foregoing, if at any time the combined capital and surplus of the Issuing Bank is less than $1,000,000,000.00 or its rating is downgraded from its current

51

rating, and provided Tenant does not replace the existing Letter of Credit with a Letter of Credit meeting the criteria of Section 38.02 within the sooner of thirty (30) days following Tenant's receipt of Landlord's notice to Tenant of either of the foregoing events or the number of days remaining until the expiration date of the existing Letter of Credit, Landlord shall have the right, at any time thereafter, to draw down the entire proceeds of the existing Letter of Credit and hold such proceeds pursuant to the terms of Section 38.01 as cash security pending the replacement of such Letter of Credit.  The Letter of Credit shall provide that:

(a)  the Issuing Bank shall pay to Landlord or its duly authorized representative an amount up to the face amount of the Letter of Credit upon presentation of the Letter of Credit and a sight draft, in the amount to be drawn;

(b)  it shall be deemed automatically renewed, without amendment, for consecutive periods of one (1) year each thereafter during the term of this Lease, unless Issuing Bank sends written notice (hereinafter referred to as the Non-Renewal Notice) to Landlord by certified or registered mail, return receipt requested, not less than sixty (60) days next preceding the expiration date of the Letter of Credit that it elects not to have the Letter of Credit renewed, and it being agreed that the giving of such Non-Renewal Notice shall for the purpose of this Article 38 be deemed a default under this Lease;

(c)  Landlord, subsequent to its receipt of a Non-Renewal Notice, and prior to the expiration date of the Letter of Credit, shall have the right, exercisable by means of sight draft, to receive the monies represented by the Letter of Credit and hold such proceeds pursuant to the terms of Section 38.01 as cash security pending the replacement of such Letter of Credit; and

(d)  upon Landlord's sale or assignment of its estate as tenant under any ground or underlying lease, the Letter of Credit shall be transferable by Landlord, as provided in Section 38.03.

Section 38.03.   In the event Landlord's estate as tenant under any ground or underlying Lease is sold or assigned, Landlord shall transfer the cash security or the Letter of Credit then held by Landlord to the vendee or assignee, and Landlord shall thereupon be released by Tenant from all liability for the return of such cash security or Letter of Credit.  In such event, Tenant agrees to look solely to the new Landlord for the return of said cash security or Letter of Credit.  It is agreed that the provisions hereof shall apply to every transfer or assignment made of the cash security or Letter of Credit to a new Landlord.

Section 38.04.   Tenant covenants that it will not assign or encumber, or attempt to assign or encumber, the monies or Letter of Credit deposited hereunder as security, and that neither Landlord nor its successors or assigns shall be bound by any such assignment, encumbrance, attempted assignment, or attempted encumbrance.

52

Section 38.05.    The use of the security, as provided in this Article, shall not be deemed or construed as a waiver of Tenant's default or as a waiver of any other rights and remedies to which Landlord may be entitled under the provisions of this Lease by reason of such default, it being intended that Landlord's rights to use the whole or any part of the security shall be in addition to but not in limitation of any such other rights and remedies; and Landlord may exercise any of such other rights and remedies independent of or in conjunction with its rights under this Article.

## ARTICLE 39

### Confidentiality

Section 39.01.    Tenant acknowledges that Tenant will have access to certain confidential information during the Term of this Lease. The term "confidential information" shall mean the terms, covenants, conditions and provisions of this Lease, including the amount of the minimum rent and the additional rent, and the plans, designs, and other documentation, used in connection with this Lease, the Demised Premises and the Building. Tenant (including any guarantor of this Lease and Tenant's affiliates) shall not use the confidential information for any purpose other than the use of the Demised Premises by Tenant in accordance with the terms of this Lease and shall not disclose any confidential information without the prior written approval of Landlord.

Section 39.02.    Tenant acknowledges that any use or disclosure of the confidential information will cause irreparable harm to Landlord.  As a consequence, Tenant agrees that if Tenant fails to abide by the terms of this Article, Landlord shall be entitled to specific performance, including the immediate issuance of a temporary restraining order or preliminary injunction enforcing the terms of this Article, and to a judgment for any damages resulting from such breach, and to any other remedies available under applicable law.

Section 39.03.    Tenant shall indemnify and hold Landlord harmless from and against any costs, expenses, claims and liabilities (including attorneys fees) relating to any and all matters concerning the use or disclosure of the confidential information by Tenant or any breach of the terms of this Article.

Section 39.04.    The terms of this Article shall continue during the Term and shall survive for a period of five (5) years after the expiration or termination of this Lease. The expiration or termination of this Lease shall not release Tenant from Tenant's obligations under this Article. Upon the expiration or termination of this Lease, Tenant shall surrender and return to Landlord all confidential information.  No confidential information shall be retained by Tenant after the expiration or termination of this Lease without Landlord's prior written approval.

53

## ARTICLE 40

### Supplemental Air Conditioning

Section 40.01.     Upon request by Tenant, Landlord shall install up to a five (5) tons water cooled supplemental air conditioning system (the "Supplemental System") in the Demised Premises.   Landlord will inform Tenant of the cost of the Supplemental System (including the cost of the installation).   Notwithstanding the foregoing, Tenant shall pay for the entire cost of the Supplemental System and the cost of the installation.   Landlord shall have no obligation or responsibility to pay for the Supplemental System.  Tenant shall be responsible for the payment to Landlord of the Supplemental System promptly upon being billed therefor by Landlord.

Section 40.02.     Tenant, at Tenant's cost and expense, (i) may tap into the existing Building condenser water riser and use up to five (5) tons of condenser water, (ii) shall maintain the Supplemental System in good condition and repair and shall make any replacements thereof as may be required, and (iii) shall obtain in Tenant's own name the use permits for the Supplemental System and provide Landlord with copies of same. Tenant shall also obtain and pay for annual renewal fees in connection therewith, and provide Landlord with a copy of such annual renewals. The Supplemental System may be operated by Tenant only during non-business hours. Landlord, at Tenant's cost, shall have the right to install a device to measure the hours of operation of the Supplemental System, which device is capable of providing a print-out verifying the date and time of usage and shall be read by Landlord. Tenant shall pay to Landlord, as additional rent, the cost of the electricity consumed by the Supplemental System, as determined by Landlord, within ten (10) days following Landlord's billing thereof. Tenant shall indemnify and hold Landlord harmless from and against any loss, claims, costs, expenses and fees (including attorneys' fees and disbursements) in connection with the repair, maintenance and replacement of the Supplemental System.

Section 40.03     With respect to Tenant's use of condenser water, Tenant shall pay to Landlord (i) the sum of $2,000 as a one (1) time "tap-in" fee, to be paid prior to said tap-in, and (ii) during each month of the term of this Lease, an amount (the "Monthly Condenser Water Amount") equal to the product obtained by multiplying (x) the number of tons of condenser water connected to the condenser water riser, to wit, five (5) times (y) 1/12th of the Condenser Water Charge (as hereinafter defined) in effect for the calendar year in which such month occurs. Landlord shall furnish bills to Tenant, from time to time, for the Monthly Condenser Water Amount and Tenant shall pay each such bill within ten (10) days after its receipt thereof. As of the date hereof, the "Condenser Water Charge" is One Thousand Five Hundred Dollars ($1,500) per ton of cooling capacity, per annum. Landlord shall have the right to increase the Condenser Water Charge, from time to time, based on Landlord's increased costs and expenses with respect to supplying condenser water to the Supplemental System.  Upon Tenant's written request, Landlord shall furnish to Tenant reasonable evidence of such increased condenser water charges.

54

Section 40.04.      Notwithstanding the provisions of this Article, in the event of Tenant's default under any of the provisions of this Lease, after notice and expiration of any applicable cure period, Landlord shall thereafter have the right to discontinue furnishing condenser water until such default has been cured by Tenant. If Tenant cures such default, Landlord shall have the right to resume furnishing condenser water as provided in this Article, provided that Tenant, at the time that Tenant has cured such default, concurrently pays to Landlord a "tap-in" fee at the aforesaid amount or at Landlord's then current charge.

Section 40.05.      Landlord, upon notice to Tenant (except in the case of an emergency) reserves the right to shut down the condenser water for such period as Landlord determines is required for repairs or service to the base Building condenser water system or as otherwise necessary in connection with the repair or installation of other tenants' supplemental air conditioning systems.

## ARTICLE 41

### Renewal Option

Section 41.01.      Provided that Tenant is not then in default (and the named Tenant is in occupancy of the entire Demised Premises), both at the time that the Tenant exercises the Renewal Option (as hereinafter defined) and at the commencement of the Renewal Term (as hereinafter defined) under any of the terms, covenants and conditions hereunder on the part of Tenant to be performed, the named Tenant shall have the option (the "Renewal Option") to extend the term of this Lease for one (1) additional period of five (5) years (the "Renewal Term"), provided that the Tenant gives Landlord notice of its exercise of the exercise of the Renewal Option at least nine (9) months but not more than eighteen (18) months prior to the expiration of the initial term hereof, with TIME OF THE ESSENCE. If Landlord does not receive the Tenant's exercise notice prior to such date, then Tenant shall have no further rights under this Article and this Article shall be of no further force or effect.

Section 41.02.      The Renewal Term shall be upon all of the same terms, covenants and conditions as are contained in this Lease, except as follows:

(a)      Tenant shall have no further right to extend the term of this Lease.

(b)      Landlord shall not be required to do any work in the Demised Premises or obligated to pay any commission and there shall be no rent abatement.

(c)      (i)      The minimum rent for the Renewal Term shall be an amount equal to the fair market annual rental value of the Demised Premises as of the commencement of the

55

Renewal Term (inclusive of the additional rent under Article 22 which shall continue to be payable as provided in said Article), but in no event less than the amount of the minimum rent and additional rent then payable during the last year of the initial term of this Lease ("Renewal Rental Value"). In the event that the parties fail to agree on the Renewal Rental Value within three (3) months prior to the Expiration Date of the initial term hereof, then the Renewal Rental Value shall be determined by arbitration in the manner as provided in Article 42, and the results of such arbitration shall be conclusive and binding on the parties.

(ii)     If for any reason the Renewal Rental Value for the Renewal Term shall not be determined prior to the commencement of the Renewal Term, Tenant, in the meantime, shall pay the monthly installments of minimum rent at an amount equal to one hundred twenty five percent (125%) of the then rate as provided in this Lease, including the additional rent then payable under Article 22. If the Renewal Rental Value as determined by arbitration shall be greater than the amount of the annual minimum rent(inclusive of additional rent under Article 22) then being payable, then within twenty (20) days after the arbitrators decision, the difference between the monthly installments for minimum rent and additional rent actually paid and the monthly installments for minimum rent and additional rent which should have been paid from the commencement of the Renewal Term shall be determined and paid by Tenant to Landlord and thereafter Tenant shall pay the monthly installments of minimum rent at the new rate.

Section 41.03.     Following the determination of the minimum rent, Landlord and Tenant shall execute an agreement amending this Lease to reflect the foregoing, but the provisions of this Article shall be effective with respect to the Renewal Term from the commencement of the Renewal Term whether or not such an amendment is executed.

## ARTICLE 42

### Arbitration

Section 42.01.    Either party may request arbitration pursuant to Article 41. The arbitration shall be held in the Borough of Manhattan, City, County and State of New York, conducted to the extent consistent with this Article in accordance with the rules then obtaining of the American Arbitration Association, or any successor body of similar function, governing commercial arbitration, except that the foregoing shall not be deemed

56

or construed to require that such arbitration actually be conducted by or before the American Arbitration Association or any successor body of similar function. The arbitration shall be conducted before arbitrators selected as follows: The party desiring arbitration shall appoint a disinterested person as arbitrator on its behalf and give notice thereof to the other party who shall, within twenty (20) days thereafter, appoint a second disinterested person as arbitrator on its behalf and give written notice thereof to the first party. The arbitrators thus appointed shall, within twenty (20) days after the date of the appointment of the second arbitrator, appoint a third disinterested person, who shall be a person licensed by the State of New York (if such license is required by law) or otherwise qualified and having the necessary expertise, including at least ten (10) year's experience, in the matter or discipline which is the primary subject or is primarily involved in such arbitration. If the arbitrators thus appointed shall fail to appoint such third disinterested person within said twenty (20) day period, then either party may, by application to the presiding Justice of Appellate Division of the Supreme Court of the State of New York for the First Judicial Department, which application shall be made within fifteen (15) days after the end of said twenty (20) day period, seek to appoint such third disinterested person, such appointment being made not later than thirty (30) days after the date of said application. Upon such appointment, such person shall be the third arbitrator as if appointed by the original two arbitrators. The decision of the majority of the arbitrators shall be final, non-appealable, conclusive and binding on all parties and judgment upon the award may be entered in any court having jurisdiction. If a party who shall have the right pursuant to the foregoing, to appoint an arbitrator, fails or neglects to do so, then and in such event the other party shall select the arbitrator not so selected by the first party, and upon such selection, such arbitrator shall be deemed to have been selected by the first party. The expenses of arbitration shall be shared equally by Landlord and Tenant, unless this Lease expressly provides otherwise, but each party shall pay and be separately responsible for its own counsel and witness fees and disbursements, unless this Lease expressly provides otherwise. Landlord and Tenant agree to sign all documents and to do all other things reasonably necessary to submit any such matter to arbitration and further agree to, and hereby do, waive any and all rights they or either of them may at any time have to revoke their agreement hereunder to submit to arbitration and to abide by the decision rendered thereunder and agree that a judgment or order may be entered in any court of competent jurisdiction based on an arbitration award (including the granting of injunctive relief).

Section 42.02.   The arbitrators shall be disinterested persons having at least ten (10) years experience in the County of New York in a calling connected with the dispute, and shall have the right to retain and consult experts and competent authorities skilled in the matters under arbitration, but any such consultation shall be made in the presence of both parties, with full right on their part to cross-examine such experts and authorities. The arbitrators shall render their decision and award upon the concurrence of at least two (2) of their number, not later than sixty (60) days after appointment of the third arbitrator. Their decision and award shall be in writing and counterpart copies thereof shall be delivered to each of the parties. In rendering their decision and award, the arbitrators shall have no power to modify or in any manner alter or reform any of the provisions of this Lease, and the jurisdiction of the arbitrators is limited accordingly.

**IN WITNESS WHEREOF,** Landlord and Tenant have duly executed this Lease as of the day and year first above written.

LANDLORD:

**475 BUILDING COMPANY, LLC,**

By:    475 Managing Member, LLC,
         its managing member

By:_____
    Charles Steven Cohen, President

TENANT:

**NOTTINGHAM CAPITAL MANAGEMENT, LLC**

By:_____
    Name: Michael T. Pilson
    Title: President

## CERTIFICATE OF ACKNOWLEDGMENT

STATE OF NEW YORK    )
                     : ss.:
COUNTY OF NEW YORK )

On the 11th day of *August* in the year 2010 before me, the undersigned, a Notary Public in and for said State, personally appeared Charles Steven Cohen, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

MADELINE C. CITRONE
Notary Public, State of New York
No. 01MA6030446
Qualified in Westchester County
Commission Expires Sept. 13, 20 13

STATE OF ~~NEW YORK~~ )
*DELAWARE*    : ss.:
COUNTY OF ~~NEW YORK~~ )
*NEW CASTLE*

On the 4th day of August in the year 2010 before me, the undersigned, a Notary Public in and for said State, personally appeared *MICHAEL T PILSON* _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

ADAM R. BRADY
Notary Public - State of Delaware
My Comm. Expires Oct. 17, 2010

59



### SCHEDULE A

**Floor Plan**

## SCHEDULE B

### Work Letter

### Lease

Between

### 475 BUILDING COMPANY, LLC

As Landlord

and

### NOTTINGHAM CAPITAL MANAGEMENT, LLC

As Tenant

Relating to a portion of the 30th floor in the Building
known as 475 Park Avenue South, New York, New York

1.      Landlord, at Landlord's expense, will perform and install the following
work to modify the existing prebuilt space, all of which shall be of material, manufacture,
design, capacity, finish and color of the building standard adopted by Landlord for the
Building ("Landlord's Work"):

(a)     Create one (1) windowed office on the southeast corner of the floor.
(b)     Furnish and install a building standard pantry with laminate
        countertops and a sink with upper and lower cabinetry.
(c)     Furnish and install new mini blinds for the windows (building standard
        color).
(d)     Furnish and install building standard carpeting with vinyl baseboard
        molding in the Tenant selected building standard colors.
(e)     Paint the Demised Premises with two (2) coats of Building standard
        paint in Tenant selected Building standard colors.

2.      If Tenant shall request that Landlord perform any additional or above
standard work (collectively, the "above standard work"), Tenant shall submit to Landlord the
necessary plans and specifications for the above standard work within ten (10) days from

61

the date hereof.  Landlord shall have the right, but not the obligation, to perform the above standard work. If, for any reason whatsoever, Tenant does not deliver to Landlord such plans and specifications prior to such date, then Landlord will have the right to install the building standard items.  If any item of the above standard work has a long lead time or causes any delay, then the date of substantial completion of Landlord's Work shall be deemed to have occurred even if such above standard work has not been substantially completed.  Landlord will have the right to submit to Tenant the price(s) for any such above standard work prior to commencing the work.  If Landlord does not receive Tenant's written rejection of such prices(s) within five (5) days from the date that Landlord delivers to Tenant such price(s), then such price(s) shall be deemed to be approved in all respects by Tenant and Landlord shall be authorized to proceed with the above standard work. Landlord, at its sole option, may perform such above standard work, at Tenant's expense, as a Tenant's extra, together with twenty-one percent (21%) of such price for Landlord's overhead.  Upon the approval of the above standard work, Tenant shall pay to Landlord as additional rent, fifty (50%) percent of the price of such work or one hundred (100%) of the price of the work if the price is less than $25,000, together with twenty-one percent (21%) of the aggregate price of all work for Landlord's overhead, and thereafter, within seven (7) days after being billed therefor, Tenant shall pay Landlord as additional rent the pro rata portion of the price of such work for which Tenant is obligated to pay or toward which Tenant is obligated to contribute, which has been previously completed.  If Tenant shall default in making such payment within seven (7) days after being billed, Landlord shall have the same rights as in the event of default by Tenant in the payment of minimum rent and additional rent, and Landlord shall have the further right to discontinue performing any additional work without the same affecting the date of substantial completion.  Upon Landlord advising Tenant that Landlord has substantially completed its work, Tenant shall pay to Landlord the entire price of such work remaining unpaid, notwithstanding that minor details or adjustments which shall not materially interfere with Tenant's use of the Demised Premises may not then have been completed.

3.     Tenant acknowledges that Landlord will be delayed in substantially completing the work to be performed by Landlord under this Schedule B, as a result of:

(i)     Tenant's delay in furnishing the final plans and specifications; or

(ii)     Tenant's request for materials, finishes or installations other than Landlord's building standard; or

(iii)     Tenant's changes in said plans; or

(iv)     Delays in the completion of work performed on behalf of Tenant by a person, firm or corporation employed by Tenant; or

(v) Any other delay caused by Tenant,

62

therefore the Commencement Date of the Lease, and the payment of minimum rent thereunder shall be accelerated by the number of days of such delay.

Tenant shall approve mechanical shop drawings within three (3) days after receipt thereof and shall approve all other shop drawings within five (5) days after receipt.

4.     Following Landlord's installation of any ceiling materials, if by reason of any work performed by or on behalf of Tenant any of the ceiling materials are damaged and/or removed by Tenant's contractor, such damaged ceiling materials shall be replaced by Landlord at the expense of Tenant.

5.     Landlord will permit Tenant and its agents to enter the Demised Premises prior to the Commencement Date of the Lease in order that Tenant may perform through its own contractors, to be first approved by Landlord in accordance with the Lease, telephone and data wiring, at the same time that Landlord's contractors are working in the space.  The foregoing license to enter prior to the Commencement Date is conditioned upon Tenant's workmen and mechanics working in harmony and not interfering with the labor employed by Landlord, Landlord's mechanics or contractors or by any other tenants or their contractors.  If at any time such entry shall cause disharmony or interference therewith, this license may be withdrawn by Landlord upon 24 hours notice to Tenant. Tenant shall, commencing as of the date of such entry into the Demised Premises, pay Landlord's charges for (i) electricity, at the rate of $3.50 per rentable square foot per annum and (ii) such items for which Tenant is separately billed hereunder, including without limitation, overtime use of the loading dock, freight elevator and HVAC service and any extra services.

6.     Workmen's compensation and commercial general liability insurance and property damage insurance, all in amounts and with companies and on forms reasonably satisfactory to Landlord, shall be provided and at all   times maintained by Tenant's contractors engaged in the performance of the work, and before proceeding with the work, certificates of such insurance shall be furnished to Landlord.

7.     Such entry by Tenant into the Demised Premises shall be deemed to be under all of the terms, covenants, and conditions of the Lease, except as to the covenant to pay the minimum rent.  Landlord shall not be liable in any way for any injury, loss or damage which may occur to any of Tenant's decorations or installations so made prior to the Commencement Date, the same being solely at Tenant's risk.

[The remainder of this page has been left blank intentionally]

63

**475 BUILDING COMPANY, LLC**

By:   475 Managing Member, LLC,
        its managing member

By:_____
        Charles Steven Cohen, President

Accepted by:

**NOTTINGHAM CAPITAL MANAGEMENT, LLC**

By:_____
    Name: Michael T. Pilson
    Title: President

## SCHEDULE C

### Description of Land

All that certain plot, piece or parcel of land situate, lying and being in the Borough of Manhattan, City, County and State of New York, and the buildings and improvements thereon, bounded and described as follows:

BEGINNING at the southeasterly corner of Park Avenue South and 32nd Street; running

thence southerly along the easterly side of Park Avenue South 162 feet 3-1/2 inches;

thence easterly parallel with 31st Street 80 feet;

thence northerly parallel with Park Avenue South 35 feet 5-7/8 inches;

thence southeasterly on an angle on its southerly side of 86 degrees 34 minutes 00 seconds with the last described line 20 feet 2 inch to a line drawn parallel with Park Avenue South and distant 100 feet easterly therefrom;

thence northerly along said last mentioned line 29 feet 3 inches to the center line of the block;

thence easterly along said center line of the block 61 feet 2 inches;

thence northerly parallel with Park Avenue South 98 feet 9 inches;

thence westerly along the southerly side of 32nd Street 161 feet 2 inches to the point or place of BEGINNING.

SAID PREMISES being known as and by the street numbers 465 to 477 Park Avenue South.

## SCHEDULE D

### Rules and Regulations

1.      The rights of tenants in the entrances, corridors, elevators and escalators of the Building are limited to ingress to and egress from the tenants' premises for the tenants and their employees, licensees, guests, customers and invitees, and no tenant shall use, or permit the use of, the entrances, corridors, escalators or elevators for any other purpose. No tenant shall invite to the tenant's premises, or permit the visit of, persons in such numbers or under such conditions as to interfere with the use and enjoyment of any of the plazas, entrances, corridors, escalators, elevators and other facilities of the Building by other tenants. Fire exits and stairways are for emergency use only, and they shall not be used for any other purposes by the tenants, their employees, licensees or invitees. No tenant shall encumber or obstruct, or permit the encumbrance or obstruction of any of the sidewalks, plazas, entrances, corridors, escalators, elevators, fire exits or stairways of the Building. The Landlord reserves the right to control and operate the public portions of the Building and the public facilities, as well as facilities, furnished for the common use of the tenants, in such manner as it deems best for the benefit of the tenants generally. Landlord further reserves the right, at any time, to install a message/package center in an area in the Building designated by Landlord and reasonably accessible to and for the common use of tenant's, and the tenants shall comply with the procedures for the same set forth by the Landlord.

2.      The reasonable cost of repairing any damage to the public portions of the Building or the public facilities or to any facilities used in common with other tenants, caused by a tenant or the employees, licensees or invitees of the tenant, shall be paid by such tenant.

3.      The Landlord may refuse admission to the Building at any time to any person not having a pass issued by the Landlord, and may require all persons admitted to or leaving the Building at any time to register. Tenant's employees, agents and visitors shall be permitted to enter and leave the building during and after ordinary business hours, subject to the reasonable requirements of Landlord. Each tenant shall be responsible for all persons for whom he requests such permission and shall be liable to the Landlord for all acts of such persons. Tenant shall obtain identification cards to be issued by Landlord for each employee and shall pay the Landlord's Building standard charge therefor. Any person whose presence in the Building at any time shall, in the judgment of the Landlord, be prejudicial to the safety, character, reputation and interests of the Building or its tenants may be denied access to the Building or may be rejected therefrom. In case of invasion, riot, public excitement or other commotion the Landlord may prevent all access to the Building during the continuance of the same, by closing the doors or otherwise, for the safety of the tenants and protection of property in the Building. The Landlord may require any person leaving the Building with any package or other object to exhibit a pass from the tenant from whose premises the package or object is being removed, but the establishment and enforcement of such requirement shall not impose any responsibility on the Landlord for the protection of any tenant against the removal of property from the

66

premises of the tenant. The Landlord shall, in no way, be liable to any tenant for damages or loss arising from the admission, exclusion or ejection of any person to or from the tenant's premises or the Building under the provisions of this rule.

4.     No tenant shall obtain or accept for use in its premises towel, barbering, boot blacking, floor polishing, lighting maintenance, cleaning or other similar services from any persons not authorized by the Landlord in writing to furnish such services, provided always that the charges for such services by persons authorized by the Landlord are comparable to the industry charge. Such services shall be furnished only at such hours, in such places within the tenant's premises and under such reasonable regulations as may be fixed by the Landlord.

5.     No awnings or other projections over or around the windows shall be installed by any tenant, and only such window blinds as are supplied or permitted by the Landlord shall be used in a tenant's premises.

6.     There shall not be used in any space, or in the public halls of the Building, either by the Tenant or by jobbers or others, in the delivery or receipt of merchandise, any hand trucks, except those equipped with rubber tires and side guards.

7.     All entrance doors in each tenant's premises shall be left locked when the tenant's premises are not in use. Entrance doors shall not be left open at any time. All windows in each tenant's premises if operable shall be kept closed at all times and all blinds therein above the ground floor shall be lowered when and as reasonably required because of the position of the sun, during the operation of the Building air conditioning system to cool or ventilate the tenant's premises.

8.     No noise, including the playing of any musical instruments, radio or television, which, in the judgment of the Landlord, might disturb other tenants in the Building shall be made or permitted by any tenant. Nothing shall be done or permitted in any tenant's premises, and nothing shall be brought into or kept in any tenant's premises, which would impair or interfere with any of the Building services or the proper and economic heating, cleaning or other servicing of the Building or the premises, or the use or enjoyment by any other tenant of any other premises, nor shall there be installed by any tenant any ventilating, air conditioning, electrical or other equipment of any kind which, in the judgment of the Landlord, might cause any such impairment or interference. No dangerous, flammable, combustible or explosive object or material shall be brought into the Building by any tenant or with the permission of any tenant.

9.     Tenant shall not permit any cooking or food odors emanating within the Demised Premises to seep into other portions of the Building.

10.     No acids, vapor or other materials shall be discharged or permitted to be discharged into the waste lines, vents or flues of the Building which may damage them. the water and wash closets and other plumbing fixtures in or serving any tenant's premises shall not be used for any purpose other than the purpose for which they were designed or

constructed, and no sweepings, rubbish, rags, acids or other foreign substances shall be deposited therein. All damages resulting from any misuse of the fixtures shall be borne by the tenant who, or whose servants, employees, agents, visitors or licensees, shall have caused the same.

11.    No signs, advertisement, notice or other lettering shall be exhibited, inscribed, painted or affixed by any tenant on any part of the outside or inside the premises or the Building without the prior written consent of the Landlord.  In the event of the violation of the foregoing by any tenant, Landlord may remove the same without any liability, and may charge the expense incurred by such removal to the tenant or tenants violating this rule.  Interior signs and lettering on doors and elevators shall be inscribed, painted, or affixed for each tenant by Landlord at the expense of such tenant, (the charge not to exceed that which a reputable outside contractor would charge), and shall be of a size, color and style reasonably acceptable to Landlord.  Landlord shall have the right to prohibit any advertising by any tenant which impairs the reputation of the building or its desirability as a building for offices, and upon written notice from Landlord, Tenant shall refrain from or discontinue such advertising.

12.    No additional locks or belts of any kind shall be placed upon any of the doors or windows in any tenant's premises and no lock on any door therein shall be changed or altered in any respect.  Upon the termination of a tenant's lease, all keys of the tenant's premises and toilet rooms shall be delivered to the Landlord.

13.    No tenant shall mark, paint, drill into or in any way deface any part of the Building or the premises demised to such tenant.  No boring, cutting or stringing of wires shall be permitted, except with the prior written consent of Landlord, which will not be unreasonably withheld or delayed, and as Landlord may reasonably direct.  No tenant shall install any resilient tile or similar floor covering in the premises demised to such tenant except in a manner approved by Landlord.

14.    No tenant shall use or occupy, or permit any portion of the premises demised to such tenant to be used or occupied, as an office for a public stenographer or typist, or as a barber or manicure shop, or as an employment bureau.  No tenant or occupant shall engage or pay any employees in the Building, except those actually working for such tenant or occupant in the Building, nor advertise for laborers giving an address at the Building.

15.    No premises shall be used, or permitted to be used, at any time, as a store for the sale or display of goods, wares or merchandise of any kind, or as a restaurant, shop, booth, bootblack or other stand, or for the conduct of any business or occupation which predominantly involves direct patronage of the general public in the premises demised to such tenant, or for manufacturing or for other similar purposes.

16.    The requirements of tenants will be attended only upon application at the office of the Building.  Employees of Landlord shall not perform any work or do

68

anything outside of the regular duties, unless under special instructions from the office of the Landlord.

17.    Each tenant shall, at its expense, provide artificial light in the premises demised to such tenant for Landlord's agents, contractors and employees while performing janitorial or other cleaning services and making repairs or alterations in said premises.

18.    The tenant's employees shall not loiter around the hallways, stairways, elevators, front, roof or any other part of the Building used in common by the occupants thereof.

19.    If the premises demised to any tenant become infested with vermin, such tenant, at its sole cost and expense, shall cause its premises to be exterminated, from time to time, to the satisfaction of Landlord and shall employ such exterminators therefor as shall be approved by Landlord.

20.    No bicycle or other vehicle and no animals shall be allowed in the showrooms, offices, halls, corridors or any other parts of the Building.

21.    Tenant shall not, without Landlord's prior written consent, install or operate any heating device, refrigerating or air conditioning equipment, steam or internal combustion engine, boiler, stove, machinery or mechanical devices upon the premises or carry on any mechanical or manufacturing business thereon, or use or permit to be brought into the Building flammable fluids such as gasoline, kerosene, benzene or naphtha or use any illumination other than electric lights. All equipment, fixtures, lamps and bulbs shall be compatible with, and not exceed the capacity of the Building's electric system. No explosives, firearms, radioactive or toxic or hazardous substances or materials, or other articles deemed hazardous to life, limb or property shall be brought into the Building or the Premises.

22.    Tenant must list all furniture and fixtures to be taken from the Building upon a form approved by Landlord.  Such list shall be presented at the office of the Building for approval before acceptance by the security officer or elevator operator.

23.    Tenant, its customers, invitees, licensees, agents, servants, employees and guests shall not encumber or obstruct sidewalks, entrances, passages, courts, vestibules, halls, elevators, stairways or other common areas in or about the Building.

24.    Tenant shall not allow anything to be placed against or near the glass in the partitions between the premises and the halls or corridors of the Building which shall diminish the light in the halls or corridors.

25.    Upon termination of this Lease, Tenant shall surrender all keys of the premises and of the Building and give to Landlord the combination of all locks on safes or vault doors in the Premises.

69

26.     Tenant shall provide the Building Manager with keys to all locks on any doors of the premises.  The Building Manager shall be allowed admittance to the premises in the event of any emergency, fire or other casualty that may arise in other appropriate instances.

27.     Unless otherwise advised by Landlord, neither Tenant nor its employees shall undertake to regulate the radiator controls of thermostats.  Tenant shall report to the office of the Building whenever such thermostats or radiator controls are not working properly or satisfactorily.

28.     All window treatments that are visible from the street shall be subject to Landlord's approval.

29.     Tenant assumes full responsibility for protecting its space from weather, theft, robbery and pilferage, which includes keeping doors locked and other means of entry into the premises closed and secured.

30.     Tenant shall not sell food of any kind or cook in the Building.  Tenant may serve complimentary foods to its guests provided that it shall first comply with all Legal Requirements.

31.     Water in the premises shall not be wasted by Tenant or its employees by tying or wedging back the faucets of the washbowls or otherwise.

32.     All messengers shall be required to sign in and obtain a pass from either the front desk or the elevator starters.  Contractors and other workmen shall use only the freight elevators for all movement within the Building.

33.     Landlord reserves the right at any time, to install a message/package center in an area in the Building designated by Landlord and reasonably accessible to and for the common use of the tenants, and tenants shall comply with the procedures for the same set forth by the Landlord.

## SCHEDULE E

## Cleaning Specifications

for

## 475 Park Avenue South
New York, New York

Landlord will perform cleaning services in the Demised Premises and related areas as follows:

<u>NIGHTLY</u>

Empty all waste receptacles.

Wipe clean all accessible areas within hand high reach; including but not limited to window sills, wall ledgers, chairs, desks, tables, file cabinets, convector enclosures, pictures and all manner of office furniture.

Wipe all glass top tables, and all doors, frames, light switches and walls.

Sweep with treated cloths all composition tile flooring.

Carpet sweep all carpeted areas, and vacuum clean weekly.

Restore chairs and waste receptacles in position.

QUARTERLY

Dust all high reach areas including top of doors, top of door frames, air diffusers, air returns, and picture frames.

Dust venetian blinds.

<u>CORE LAVATORIES</u> (Nightly or as otherwise designated)

Wash, disinfect and dry all bowls, seats urinals, washbasins and mirrors.

Wash, disinfect and wipe dry all metal work.

Insert and replace toilet tissue, toweling and soap, materials to be supplied by Tenant.

71

Empty paper towel and sanitary napkin disposal receptacles and remove to designated area.

Sweep and wash floors.

Wipe clean all sills, partitions and ledges.

Wipe clean exterior of waste cans and dispensing units.

Wash partitions monthly.

Wash tile walls monthly.

Wash and dry interior of waste cans and sanitary disposal containers weekly.

## WINDOW CLEANING SERVICES

Clean all exterior windows, inside and out periodically during the year, as Landlord deems necessary.

## RUBBISH REMOVAL SERVICES

Empty ordinary dry rubbish waste baskets used in the normal course of business from the office premises daily, Monday through Friday, holidays and week ends excepted.

## SCHEDULE F

### Definitions

(a)     The term <u>mortgage</u> shall include an indenture of mortgage and deed of trust to a trustee to secure an issue of bonds, and the term <u>mortgagee</u> shall include such a trustee.

(b)     The terms <u>include</u>, <u>including</u> and <u>such as</u> shall each be construed as if followed by phrase "without being limited to".

(c)     The term <u>obligations of this lease</u>, and words of like import, shall mean the covenants to pay rent and additional rent under this lease and all of the other covenants and conditions contained in this lease.  Any provision in this lease that one party or the other or both shall do or not do or shall cause or permit or not cause or permit a particular act, condition, or circumstance shall be deemed to mean that such party so covenants or both parties so covenant, as the case may be.

(d)     The term <u>Tenant's obligations hereunder</u>, and words of like import, and the term <u>Landlord's obligations hereunder</u>, and words of like import, shall mean the obligations of this lease which are to be performed or observed by Tenant, or by Landlord, as the case may be.  Reference to <u>performance</u> of either party's obligations under this lease shall be construed as "performance and observance".

(e)     Reference to Tenant or Landlord being or not being <u>in default hereunder</u>, or words of like import, shall mean that Tenant or Landlord is in default in the performance of one or more of Tenant's or Landlord's obligations hereunder, or that Tenant or Landlord is not in default in the performance of any of Tenant's or Landlord's obligations hereunder, or that a condition of the character described in Section 16.01 has occurred and continues or has not occurred or does not continue, as the case may be.

(f)     The term <u>laws and/or requirements of public authorities</u> and words of like import shall mean laws and ordinances of any or all of the Federal, state, city, county and borough governments and rules, regulations, orders and/or directives of any or all departments, subdivisions, bureaus, agencies or offices thereof, or of any other governmental, public or quasi-public authorities, having jurisdiction in the premises, and/or the direction of any public officer pursuant to law.

(g)     The term <u>requirements of insurance bodies</u> and words of like import shall mean rules, regulations, orders and other requirements of the New York Board of Fire Underwriters and/or the New York Fire Insurance Rating Organization and/or any other similar body performing the same or similar functions and having jurisdiction or cognizance of the Building and/or the Demised Premises.

(h)     Reference to <u>termination of this lease</u> includes expiration or earlier termination of the term of this lease or cancellation of this lease pursuant to any of provisions of this lease or to law.  Upon a termination of this lease, the term and estate granted by this lease shall end at noon of the date of termination as if such date were the date of expiration of the term of this lease and neither party shall have any further obligation or liability to the other after such termination (i) except as shall be expressly provided for in this lease, or (ii) except for such obligation as by its nature or under the circumstances can only be, or by the provisions of this lease, may be, performed after such termination, and, in any event, unless expressly otherwise provided in this lease, any liability for a payment which shall have accrued to or with respect to any period ending at the time of termination shall survive the termination of this lease.

(i)     The term <u>in full force and effect</u> when herein used in reference to this lease as a condition to the existence or exercise of a right on the part of Tenant shall be construed in each instance as including the further condition that at the time in question no default on the part of Tenant exists, and no event has occurred which has continued to exist for such period of time (after the notice, if any, required by this lease), as would entitle Landlord to terminate this lease or to dispossess Tenant.

(j)     The term <u>Tenant</u> shall mean Tenant herein named or any assignee or other successor in interest (immediate or remote) of Tenant herein named, but only while such Tenant or such assignee or other successor in interest, as the case may be, is in possession of the Demised Premises as owner of the Tenant's estate and interest granted by this lease and also, if Tenant is not an individual or a corporation, all of the persons, firms and corporations then comprising Tenant.

(k)     Words and phrases used in the singular shall be deemed to include the plural and vice versa, and nouns and pronouns used in any particular gender shall be deemed to include any other gender.

74