# LIMITED LIABILITY COMPANY AGREEMENT
## FOR
## NOTTINGHAM CAPITAL MANAGEMENT LLC

GORDON, FOURNARIS & MAMMARELLA, P.A.
1925 LOVERING AVENUE
WILMINGTON, DE  19806

**LIMITED LIABILITY COMPANY AGREEMENT**
**FOR**
**NOTTINGHAM CAPITAL MANAGEMENT LLC**

**Table of Contents**

**I. FORMATION AND PURPOSE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.1    **Governing Law and Government Filings** . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.2    **Name** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.3    **Purpose of the Company** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.4    **Registered Office; Registered Agent** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.5    **Principal Place of Business** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.6    **Expenses of Formation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**II. TERM** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    2.1    **Term** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**III. CAPITAL CONTRIBUTIONS AND COMPANY INTERESTS** . . . . . . . . . . . . . . . . . 2
    3.1    **Company Capital** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    3.2    **Initial Capital Contribution** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    3.3    **Payment of Contributions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    3.4    **Company Interest** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    3.5    **Percentage of Company Interests** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
            (a)    Initial Company Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
            (b)    Adjustments in Steiner Company Interests . . . . . . . . . . . . . . . . . . . 3
            (c)    Dilution of Company Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
            (d)    Percentage Company Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    3.6    **Form of Contributions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    3.7    **Additional Capital Contributions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
                 (a)    No Right to Make Additional Capital Contributions . . . . . 4
                 (b)    Required Additional Capital Contributions . . . . . . . . . . . 4
                 (c)    Defaulting Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    3.8    **Withdrawal of Capital Contributions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    3.9    **Use of Contributions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    3.10    **Ownership of Property** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    3.11    **No Right of Partition** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    3.12    **Composition of Capital Accounts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
            (a)    Contributions, Income and Gains . . . . . . . . . . . . . . . . . . . . . . . . . 5
            (b)    Distributions, Deductions and Losses . . . . . . . . . . . . . . . . . . . . . . 5
    3.13    **Transferee's Capital Account** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    3.14    **Compliance with Applicable Federal Tax Laws** . . . . . . . . . . . . . . . . . . . 6

**IV. ALLOCATIONS AND DISTRIBUTIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    4.1    **Allocation of Company Items** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

| 4.2 | **Priority Among Members** | 6 |
| 4.3 | **Reallocation on Transfer** | 6 |
| 4.4 | **Qualified Income Offset** | 6 |
| 4.5 | **Partnership Minimum Gain** | 7 |
| 4.6 | **Compliance With Code and Regulations** | 7 |
| 4.7 | **Distribution of Net Cash** | 7 |
| | (a) | Deemed Distributions | 7 |
| | (b) | Priority Distribution | 7 |
| | (c) | Priority Annual Distributions | 7 |
| | (d) | Regular Distribution | 7 |
| | (e) | Definitions | 8 |
| 4.8 | **Draws** | 8 |

**V. COMPETITION; SOLICITATION; CONFIDENTIALITY** ........................ 8
| 5.1 | **Representations of Managers** | 8 |
| 5.2 | **Disclosure of Information** | 9 |
| 5.3 | **Non-Competition** | 9 |
| 5.4 | **Non-Solicitation** | 10 |
| 5.5 | **Reasonableness of Restrictions** | 10 |
| 5.6 | **Enforcement** | 10 |
| 5.7 | **Remedies for Breach of Covenants of Non-Disclosure and Non-Competition** ........................ 10 |
| 5.8 | **Termination of Term of Covenants** | 11 |

**VI. TAX, FINANCIAL AND ACCOUNTING MATTERS** ........................ 11
| 6.1 | **Fiscal Year and Accounting Method** | 11 |
| 6.2 | **Annual Tax Return** | 11 |
| 6.3 | **Tax and Accounting Matters** | 11 |
| 6.4 | **Books and Records** | 11 |
| 6.5 | **Bank Account** | 12 |
| 6.6 | **Annual Budget** | 12 |

**VII. MEMBERS** ........................ 12
| 7.1 | **Management Authority of Members** | 12 |
| 7.2 | **Liability of Members** | 12 |
| 7.3 | **Power of Attorney** | 12 |
| 7.4 | **Vote of the Members** | 13 |
| | (a) | Majority Vote | 13 |
| | (b) | Super-Majority Vote | 13 |

**VIII. MANAGERS** ........................ 13
| 8.1 | **Management Authority of Managers** | 13 |
| 8.2 | **Duties of Loyalty and Care of Managers** | 13 |
| 8.3 | **General Powers of the Managers** | 13 |
| 8.4 | **Specific Powers of the Managers** | 14 |

| | | | |
|---|---|---|---|
| 8.5 | **Limitations on Managers' Authority** | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14 |
| 8.6 | **Compensation for Managers** | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15 |
| 8.7 | **Indemnification of Members and Managers** | . . . . . . . . . . . . . . . . . . . . . . . | 15 |
| 8.8 | **Selection of Managers** | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15 |
| 8.9 | **Resignation and Removal of Manager** | . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16 |
| 8.10 | **Officers** | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16 |
| | (a) | Appointment, Revocation and Removal | . . . . . . . . . . . . . . . . . . . . . . . 16 |
| | (b) | Signing Authority | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16 |

**IX. ADMISSION AND RESIGNATION OF MEMBERS** . . . . . . . . . . . . . . . . . . . . . . . 16

| | | |
|---|---|---|
| 9.1 | **Initial Members** | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16 |
| 9.2 | **Additional Members** | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16 |
| 9.3 | **Successor Members** | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16 |
| 9.4 | **Preconditions to Admission** | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17 |
| 9.5 | **Assignee of a Member** | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17 |
| 9.6 | **Resignation of Members** | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17 |
| 9.7 | **Payments to Wrongfully Resigning Member** | . . . . . . . . . . . . . . . . . . . . . . 17 |

**X. TRANSFER OF COMPANY INTERESTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

| | | | |
|---|---|---|---|
| 10.1 | **Restrictions on Transfer by Members** | . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17 |
| 10.2 | **Voluntary Transfers** | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18 |
| | (a) | Offer to Sell to the Company | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18 |
| | (b) | Acceptance of Offer by the Company | . . . . . . . . . . . . . . . . . . . . . . . . 18 |
| | (c) | Offer to Sell to the Other Members | . . . . . . . . . . . . . . . . . . . . . . . . . 18 |
| | (d) | Acceptance of Offer by the Other Members | . . . . . . . . . . . . . . . . . . . 18 |
| | (e) | Pro Rata Exercise by the Other Members | . . . . . . . . . . . . . . . . . . . . 18 |
| | (f) | Purchase Price and Payment Terms | . . . . . . . . . . . . . . . . . . . . . . . . . 19 |
| | (g) | Closing | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19 |
| | (h) | Right of First Refusal | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19 |
| 10.3 | **Death of a Member** | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19 |
| | (a) | Offer to Sell to the Company | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19 |
| | (b) | Acceptance of Offer by the Company | . . . . . . . . . . . . . . . . . . . . . . . . 20 |
| | (c) | Offer to Sell to the Other Members | . . . . . . . . . . . . . . . . . . . . . . . . . 20 |
| | (d) | Mandatory Acceptance by the Other Members | . . . . . . . . . . . . . . . . . 20 |
| | (e) | Closing | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20 |
| 10.4 | **Disability of a Member** | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20 |
| | (a) | Offer to Sell to the Company | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20 |
| | (b) | Acceptance of Offer by the Company | . . . . . . . . . . . . . . . . . . . . . . . . 21 |
| | (c) | Offer to Sell to the Other Members | . . . . . . . . . . . . . . . . . . . . . . . . . 21 |
| | (d) | Mandatory Acceptance by the Other Members | . . . . . . . . . . . . . . . . . 21 |
| | (e) | Closing | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21 |
| | (f) | Definition of Permanent Disability | . . . . . . . . . . . . . . . . . . . . . . . . . 21 |
| 10.5 | **Involuntary Transfer; Right to Call Company Interest** | . . . . . . . . . . . . . . . | 22 |
| | (a) | Event of Transfer | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22 |
| | (b) | Right of Company to Call Company Interest | . . . . . . . . . . . . . . . . . . . 22 |
| | (c) | Right of Other Members to Call Company Interest | . . . . . . . . . . . . . . 22 |

|  | (d) | Pro Rata Exercise by the Other Members . . . . . . . . . . . . . . . . . . . . . . . 23 |
|  | (e) | Closing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23 |
| 10.6 | **Purchase Price; Payment Terms** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23 |
|  | (a) | Unit Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23 |
|  | (b) | Purchase Price . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24 |
|  | (c) | Payment Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24 |
|  | (d) | Life Insurance Applied to Purchase Price . . . . . . . . . . . . . . . . . . . . . . 25 |
| 10.7 | **Purchase of Life Insurance** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26 |
| 10.8 | **Permitted Transfers** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26 |
|  | (a) | Permitted Transferees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26 |
|  | (b) | Limitation on Transfers by Pilson . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26 |
| 10.9 | **Percentage of Limitations on Transfers** . . . . . . . . . . . . . . . . . . . . . . . . 26 |
| 10.10 | **Costs and Expenses of Transfer** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27 |
| 10.11 | **Action of Members** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27 |

**XI. DISSOLUTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

| 11.1 | **Waiver** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27 |
| 11.2 | **Events Causing Dissolution** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27 |
| 11.3 | **Winding Up** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27 |
| 11.4 | **Final Accounting; Deficit Capital Accounts** . . . . . . . . . . . . . . . . . . . . . 27 |
| 11.5 | **Priority of Distributions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28 |
| 11.6 | **Payment of Claims** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28 |
| 11.7 | **Distributions in Kind** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28 |

**XII. MISCELLANEOUS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

| 12.1 | **Separability** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29 |
| 12.2 | **Survival of Rights** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29 |
| 12.3 | **Entire Agreement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29 |
| 12.4 | **Applicable Law** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29 |
| 12.5 | **Notices** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29 |
| 12.6 | **Interpretation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29 |
| 12.7 | **Waiver** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30 |
| 12.8 | **Agreement in Counterparts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30 |
| 12.9 | **Arbitration** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30 |
| 12.10 | **Enforceability** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30 |
| 12.11 | **Time is of the Essence** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30 |
| 12.12 | **Tax Status** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30 |
| 12.13 | **Legal Representation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30 |

# LIMITED LIABILITY COMPANY AGREEMENT
## FOR
## NOTTINGHAM CAPITAL MANAGEMENT LLC

THIS LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") is made effective the 6th day of October, 2009 (the "Effective Date"), by and between MICHAEL T. PILSON ("Pilson") and MICHAEL STEINER ("Steiner"), both of New Castle County, Delaware (collectively the "Members" and individually a "Member"), and MICHAEL T. PILSON (the "Manager").

## PREAMBLE

A.       Whereas, the parties to this Agreement desire to form a limited liability company (the "Company") for the purpose set forth in this Agreement; and

B.       Whereas, by entering into this Agreement the parties desire to provide for (i) the purpose for which the Company is formed; (ii) the division of the Company's net profits and net losses; (iii) the restrictions on the disposition of Company property and Company interests; (iv) the management of the Company's business, (v) the duration of the Company's existence; and (vi) various other matters relating to the Company.

NOW, THEREFORE, in consideration of the premises and the mutual promises, covenants and agreements contained in this Agreement, the parties to this Agreement, intending to be legally bound by this Agreement, agree to form a limited liability company under the laws of the State of Delaware in accordance with the following terms and conditions:

## I. FORMATION AND PURPOSE

1.1       **Governing Law and Government Filings**.  The Company shall be formed in accordance with and shall be governed by the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 et seq. (the "Act"), except to the extent that the Act permits variation by agreement of the parties and this Agreement provides for such variations.  On the effective date of this Agreement, the Members shall cause a Certificate of Formation that complies with the requirements of the Act to be properly filed with the Office of the Secretary of State for the State of Delaware (the "Certificate") and shall execute such further documents and take such further action as is necessary or appropriate from time to time to comply with the requirements for the formation and operation of a limited liability company in the State of Delaware and in all other jurisdictions where the Company conducts its business.

1.2       **Name**.  The name of the Company shall be Nottingham Capital Management LLC.

1.3       **Purpose of the Company**.  The purpose and business of the Company shall be (a) to manage investment funds, either directly or through equity interests in investment funds; (b) to provide management services to such investment funds; (c) acquire, own, hold, manage,

operate, improve, develop and otherwise deal with such real, personal or intangible property as the Company may acquire from time to time, all of which property is sometimes referred to in this Agreement as the "Company Property"; (d) to sell, dispose, exchange, or otherwise encumber all or any part of the Company's interest in the Company Property; (e) to conduct such other activities as may be necessary or appropriate to promote the business of the Company; and (f) to engage in any other lawful business activity approved by the Managers.

      1.4    **Registered Office; Registered Agent**.  The name of the registered agent for service of process on the Company in the State of Delaware is Brantwyn Corporate Services, LLC.  The address of the registered agent of the Company and the address of the registered office of the Company in the State of Delaware is 270 Presidential Drive, Wilmington, Delaware 19807.

      1.5    **Principal Place of Business**.  The Company's principal place of business shall be located at 3799 N. DuPont Highway, Dover, Delaware 19901 or at such other place as the Managers may select from time to time.

      1.6    **Expenses of Formation**.  The Company shall bear the expenses incident to its formation.  Each Member shall bear his own personal expenses, if any, incurred in connection with his decision to enter into this Agreement.

## II. TERM

      2.1    **Term**.  The term of the Company shall commence on the date of the filing of a Certificate with the Office of the Secretary of State of the State of Delaware pursuant to § 18-201 of the Act and shall continue until terminated as provided by this Agreement or the Act.

## III. CAPITAL CONTRIBUTIONS AND COMPANY INTERESTS

      3.1    **Company Capital**.  The capital of the Company shall be the aggregate sum of the capital contributions made by the Members to the Company in the manner provided for in this Agreement.  Each Member shall own a share of the total capital of the Company in proportion to that Member's Company interest.

      3.2    **Initial Capital Contribution**.  The initial capital contribution of the Members to the Company shall be as follows:

| Name of Member | Amount of Contribution |
|---|---|
| Michael T. Pilson | $ 800.00 |
| Michael Steiner | 200.00 |
| Total | $ 1,000.00 |

3.3     **Payment of Contributions**. Each Member's capital contribution shall be made by delivering it to the Company within the ninety (90) day period immediately following the execution of this Agreement by that Member.

3.4     **Company Interest**. For purposes of this Agreement, the term "Company interest" shall mean each Member's share of the Company's net profits and net losses, the right to receive distributions of Company Property and the rights, powers and liabilities of a Member as defined and described in the Act and this Agreement. The nature of a Company interest shall be personal property for all purposes.

3.5     **Percentage of Company Interests**.

(a)     Initial Company Interests. The Company interest of the Members shall be represented by One Thousand (1000) Company Units (the "Units"). Each Member's initial Company interest shall be equal to the number of Units set forth below:

| Name of Member | No. of Units |
|---|---|
| Michael T. Pilson | 800 |
| Michael Steiner | 200 |
| Total | 1000 |

(b)     Adjustments in Steiner Company Interests.

(i) Adjustment for Additional Capital Contributions. In the event that the aggregate Additional Capital Contributions of Steiner pursuant to Subsection 3.7 of this Agreement exceed the sum of One Million Dollars ($1,000,000.00), Steiner's Units shall be increased by fifty (50) Units and Pilson's Units shall be decreased by an equal number of Units, effective as of the first day of the month immediately following such event.

(ii) Equitable Apportionment for Permitted Transferees of Steiner. Any adjustments with respect to Steiner shall be equitably apportioned between him and his Permitted Transferees, if any.

(c)     Dilution of Company Interests. Until the Investment Return Date, Steiner's Company interest shall not be diluted by the admission of any additional Member. For the purposes of this Agreement, the "Investment Return Date" means first date on which the total of the value of his Company interest, plus the value of his general partner interests in the funds managed by the Company, plus all distributions from the Company and the funds managed by the Company, equals ten (10) times the aggregate amount of his Capital Contributions.

        (d)    <u>Percentage Company Interest</u>. Each Member's Company interest at any given time shall be calculated on the basis of the number of Units owned by that Member to the total number of Units owned by all of the Members.

        3.6    **Form of Contributions**. Unless specified otherwise in this Agreement, all capital contributions made by a Member to the Company shall be made in the form of cash. No capital contributions shall be made by a Member to the Company in property other than cash, unless specifically agreed to in writing between the contributing Member and the Managers, which writing shall:  (a) identify the property to be contributed; (b) state the fair market value of the property on the date of contribution; (c) state the amount and nature of all liabilities secured by the property and the extent, if any, to which the Company shall assume or take subject to any of those liabilities; and (d) state the adjusted basis of the property for federal income tax purposes in the hands of the contributing Member immediately prior to its contribution.

        3.7    **Additional Capital Contributions**.

        (a)    <u>No Right to Make Additional Capital Contributions</u>. No Member shall be required to make any further or additional capital contributions to the Company, except as required by the Act or this Agreement. No Member shall have the right to make additional capital contributions to the Company, except as approved by the Managers.

        (b)    <u>Required Additional Capital Contributions</u>. If at any time (or from time to time) on or before the second anniversary of the Effective Date additional funds in excess of the initial capital contributions ("Additional Capital Contributions") are required by the Company for or in respect of its business or any of its obligations, expenses, costs or liabilities (including, but not limited to, payment of compensation to the Managers, other operating expenses and any reserves which the Managers deems necessary or appropriate), the Managers may notify Steiner of such fact and request that he make an Additional Capital Contribution to the Company in the aggregate of the total amount of funds required. Steiner shall be obligated to make his Additional Capital Contribution within fifteen (15) days after the delivery of the Managers's notice. Such funds shall be deemed to be Additional Capital Contributions of Steiner and shall increase his Capital Account. The Additional Capital Contributions of Steiner shall not exceed One Million Five Hundred Thousand Dollars ($1,500,000.00).

        (c)    <u>Defaulting Members</u>. In the event Steiner fails to make any Additional Capital Contributions required under this Agreement (a "Defaulting Member"), the Managers may (i) request the other Members (the "Contributing Members"), and the Contributing Members may thereupon elect, in their discretion, to either (A) advance such funds to the Company and have such funds be treated as a loan (the "Defaulting Member Loan") to the Company, which such Defaulting Member Loan shall take priority over other Member Loans, if any, and shall bear interest at a floating interest rate, computed daily at two (2) percentage points per annum in excess of the prime rate as set forth in the <u>Wall</u> <u>Street</u> <u>Journal</u>, which interest rate shall change as and when the prime rate changes or (B) advance such funds to the Company and have such funds be treated as an Additional Capital Contribution to the Company, or (ii) treat the Defaulting Member's failure to make an Additional Capital Contribution as an Event of Transfer for purposes of Subsection 10.8 of this Agreement. In the event that the Managers request, and the

Contributing Members thereupon elect, to have such funds treated as an Additional Capital Contribution, each of the Members' Membership interests shall be adjusted to a percentage equal to (i) the aggregate amount of Capital Contributions and Additional Capital Contributions actually made by each of such Members, divided by (ii) the aggregate amount of Capital Contributions and Additional Capital Contributions made by all Members.

3.8     **Withdrawal of Capital Contributions**.  No Member shall have the right to withdraw or reduce his capital contributions to the Company, except as approved by the Managers.  No Member shall have the right to demand and receive any distribution from the Company in any form other than cash, unless approved by the Managers.  No Member shall be entitled to receive any interest on his capital contributions to the Company.

3.9     **Use of Contributions**.  The aggregate of all capital contributions made by the Members to the Company shall be available to the Company to carry out the purposes of the Company.

3.10    **Ownership of Property**.  All Company Property, whether real or personal, tangible or intangible, shall be owned by the Company.  No Member shall have any interest in the specific Company Property.

3.11    **No Right of Partition**.  Each Member waives any right he may have to cause Company Property to be partitioned or otherwise divided among the Members, or to file a complaint or institute any proceeding at law or equity to cause Company Property to be partitioned or otherwise divided among the Members.

3.12    **Composition of Capital Accounts**.  The Company shall establish and maintain a separate capital account for each Member in accordance with applicable federal tax laws.  Each Member's capital account shall be determined and maintained as follows:

(a)     Contributions, Income and Gains.  Each Member's capital account shall be increased by:  (1) the amount of money contributed by that Member; (2) the fair market value at the time of contribution of all property other than money contributed by that Member, reduced by any liabilities secured by that property which are assumed or taken subject to by the Company; and (3) that Member's share of Company income and gains, including income and gains which are exempt from or not recognized for federal income tax purposes, as computed for book purposes; and

(b)     Distributions, Deductions and Losses.  Each Member's capital account shall be decreased by:  (1) the amount of money distributed to that Member; (2) the fair market value at the time of distribution of all property other than money distributed to that Member, reduced by any liabilities secured by that property which are assumed or taken subject to by that Member; and (3) that Member's share of Company losses and deductions, including Company expenditures which are not deductible or capitalizable for federal income tax purposes, as computed for book purposes.

3.13    **Transferee's Capital Account.** In the event of a permitted transfer of a Company interest as provided in this Agreement, the capital account of the transferor shall become the capital account of the transferee to the extent it relates to the transferred Company interest.

3.14    **Compliance with Applicable Federal Tax Laws.** The manner in which the capital accounts of the Members are to be maintained pursuant to this Section III of this Agreement is intended to comply with the requirements of all applicable federal tax laws. If in the opinion of the Managers the manner in which capital accounts are to be maintained pursuant to this Section III of this Agreement should be modified in order to comply with the applicable federal tax laws, then notwithstanding anything contained in this Agreement to the contrary, the Managers may, in their sole and unrestricted discretion, alter the method in which the capital accounts are maintained, and the Managers shall have the right to amend this Agreement without action by the Members to reflect any such change in the manner in which capital accounts are maintained; provided, however, that any change in the manner of maintaining capital accounts shall not materially alter the economic agreement between the Members.

## IV.  ALLOCATIONS AND DISTRIBUTIONS

4.1    **Allocation of Company Items.** Except as otherwise required by applicable federal tax laws, all items of income, gain, loss, deduction or credit of the Company shall be allocated among the Members in proportion to their Company interests; provided, however, that for federal income tax purposes such items of income, gain, loss and deduction or credit with respect to property contributed by a Member to the Company shall be allocated between the Members so as to take account of the variation between the federal income tax basis of the property to the Company and its fair market value at the time of its contribution to the Company in accordance with applicable federal tax laws.

4.2    **Priority Among Members.** Unless specified otherwise in this Agreement, no Member shall have priority over any other Member with regard to the return of capital, the allocation of any Company items or the distribution of Company Property.

4.3    **Reallocation on Transfer.** In the event that a Member's Company interest is transferred in accordance with the provisions of this Agreement, the allocations provided in this Section IV of this Agreement shall be further reallocated between the transferor and the transferee in the same ratio as the number of days each of them owned the Company interest during the fiscal year of the Company for which the allocation is being made, unless the books of the Company permit the allocation of items of income and expense to the periods of time before and after the transfer, in which case the latter allocation shall be made.

4.4    **Qualified Income Offset.** Notwithstanding the provisions of Subsection 4.1 of this Agreement, if any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), which create or increase a deficit capital account balance for such Member, then items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year) shall be specially allocated to such Member in an amount

and manner sufficient to eliminate the deficit capital account balance as quickly as possible. It is the intent of the parties to this Agreement that this Subsection 4.4 of this Agreement be interpreted to comply with the alternative test for economic effect set forth in Treasury Regulation Section 1.704-1(b)(2)(ii)(d).

     4.5    **Partnership Minimum Gain**. Notwithstanding the provisions of Subsection 4.1 of this Agreement, beginning in the first fiscal year in which the Company has "nonrecourse deductions" (as defined in Treasury Regulation Section 1.704-2(b)(1)), or makes a distribution of proceeds of a "nonrecourse liability" (as defined in Treasury Regulation Section 1.752-1(a)(2)), that is allocable to an increase in "partnership minimum gain" (as defined in Treasury Regulation Section 1.704-2(d)(1)), and in each fiscal year thereafter, if there is a net decrease in "partnership minimum gain" during a fiscal year, then any Member with a deficit balance in his capital account at the end of such fiscal year shall be allocated, before any other allocation is made of Company items for such year, items of income and gain for such fiscal year (and, if necessary, subsequent years) in the amounts and proportions needed to eliminate such deficit as quickly as possible. It is the intent of the parties to this Agreement that such allocations are to be made in accordance with the "minimum gain chargeback" provisions of Treasury Regulation Section 1.704-2(f).

     4.6    **Compliance With Code and Regulations**. The manner in which items of income, gain, loss, deduction or credit of the Company are to be allocated pursuant to this Section IV of this Agreement is intended to comply with Section 704 of the Internal Revenue Code of 1986, as amended (the "Code"), and the Treasury Regulations promulgated thereunder, and shall be interpreted and applied in a manner consistent therewith.

     4.7    **Distribution of Net Cash**. Following the end of each fiscal year of the Company and the adjustment of the Member's capital accounts for that fiscal year, the Company shall distribute the Net Cash (as defined in Paragraph 4.7(d) of this Agreement) of the Company to the Members, in the indicated order of priority:

     (a)    Deemed Distributions. First, deemed distributions of Net Cash in an amount equal to any management fee offset(s).

     (b)    Priority Distribution. Second, distributions of the balance, if any, of Net Cash shall be made to Steiner in an amount equal to his Unrecovered Capital (as defined in Paragraph 4.7(d) of this Agreement), if any.

     (c)    Priority Annual Distributions. Third, distributions of Net Cash in an amount equal to the Priority Annual Distribution (as defined in Paragraph 4.7(e) of this Agreement) shall be made among the Members in proportion to their Company interests.

     (d)    Regular Distribution. Fourth, distributions of the balance, if any, of Net Cash shall be made among the Members in proportion to their Company interests.

(e)    Definitions.

(i) "Net Cash". "Net Cash" shall be an amount equal to the net profits of the Company, except that (A) depreciation of buildings, improvements, personal property and amortization of leasehold improvement, if applicable, shall not be considered a deduction, (B) repayment of principal of debts shall be considered a deduction, (C) any amounts expended on behalf of the Company by the Managers for capital improvements or new investments shall be considered a deduction, and (D) if the Managers find it necessary or advisable or required by applicable law, a reasonable reserve (including, but not limited to, an amount equal to one hundred percent (100%) of any general partner commitments) shall be deducted for capital needs to provide a reserve to be invested in additional Company Property, to provide funds for improvements, or for any other contingency of the Company.

(ii) "Priority Annual Distribution". The "Priority Annual Distribution" for each year shall be an amount equal to the Distribution Percentage (as defined in this Paragraph 4.7(d) of this Agreement) times the Company's taxable income.

(iii) "Distribution Percentage". The "Distribution Percentage" shall equal the highest marginal income tax rate (combined state and federal) to which any Member of the Company may be subject, as determined by the Manager, plus twenty percent (20%).

(iv) "Unrecovered Capital". "Unrecovered Capital" for any Member as of any date, shall equal the excess, if any, of (A) the sum of (I) such Member's initial capital contribution pursuant to Subsection 3.2 of this Agreement and (II) any additional capital contributions made by such Member pursuant to Subsection 3.7 of this Agreement, over (B) the cumulative amount of money and the fair market value of any property (other than money) distributed to such Member pursuant to Paragraph 4.7(b) of this Agreement and Paragraph 11.5(c) of this Agreement as of such date.

4.8    **Draws**. With the approval of the Managers, at the beginning of each fiscal year, a periodic draw in anticipation of the distribution of Net Cash to that Member for that fiscal year may be established for one (1) or more Members. Any amounts so withdrawn during the fiscal year shall be credited against any Net Cash distributable to that Member at the end of that fiscal year. To the extent such withdrawals exceed a Member's Net Cash distribution for the same fiscal year, the excess shall be a liability of that Member to the Company payable upon demand but without interest. A periodic drawing right once determined may be terminated by the Managers at any time during the course of the Company's fiscal year if it appears unlikely that the Net Cash distributable to that Member for that fiscal year shall equal or exceed that Member's withdrawals.

## V. **COMPETITION; SOLICITATION; CONFIDENTIALITY**

5.1    **Representations of Managers**. Each Manager represents and warrants that the Manager is not, and will not during the term of this Agreement become, a party to any agreement other than this Agreement that would adversely affect the Manager's ability to perform the

Manager's duties under this Agreement. Each Manager shall annually certify the foregoing to the Company.

     5.2     **Disclosure of Information**.  Each Member and Manager (each a "Restricted Party") agrees not to, during or after the period of the Restricted Party's relationship with the Company, without the Company's prior written consent, disclose any confidential or proprietary information (as hereinafter defined in this Subsection 5.2 of this Agreement) concerning the Company or the business of the Company to any person, firm, corporation, association or other entity (other than the Company, its Members, Managers, attorneys and advisors) for any reason or purpose whatsoever, nor shall the Restricted Party make use of any such confidential or proprietary information for the Restricted Party's own purpose or for the benefit of any person, firm, corporation, association or other entity, except the Company. Each Restricted Party agrees that all such confidential or proprietary information, together with all notes, records, and other documents relating thereto, and all copies or facsimiles thereof, in the possession of or available to the Restricted Party, are the exclusive property of the Company. As used in this Subsection 5.2 of this Agreement, the term "confidential or proprietary information" shall mean all information in any way relating, directly or indirectly, to the activities, business or affairs of the Company or any of the customers, clients or business prospects of the Company, including, but not limited to, any contracts, negotiations to enter into contracts, trade secrets, books and records, customer or client lists, software and hardware packages, vendor lists, distribution channels, pricing information, private process, tax and financial matters, marketing plans, as they may exist from time to time, which the Restricted Party may acquire or obtain in connection with the Restricted Party's relationship with the Company. Upon the termination of the Restricted Party's relationship with the Company the Restricted Party shall deliver to the Company all confidential or proprietary information relating to the Company in the possession of or available to the Restricted Party, together with all other materials, documents, and other items obtained, received or used by the Restricted Party during the course of the Restricted Party's relationship with the Company, without retaining a copy thereof. Notwithstanding anything herein to the contrary, a Restricted Party has the right to disclose confidential or proprietary information without the prior written consent of the Company as required by any court or other governmental authority, or as otherwise required by law. If a Restricted Party believes that the Restricted Party will be compelled by a court or other authority to disclose confidential or proprietary information, the Restricted Party shall give the Company prompt written notice so that the Company may take steps to oppose such disclosure.

     5.3     **Non-Competition**.  Each Restricted Party acknowledges and recognizes the highly competitive nature of the business of the Company, and that through the Restricted Party's relationship with the Company, the Restricted Party will acquire confidential or proprietary information concerning the Company and, accordingly, agrees not to, directly or indirectly, from and after the date of this Agreement and for a period of one (1) year following the complete termination of a Restricted Party's interest in the Company (i) engage in any Competitive Business (as hereinafter defined in this Subsection 5.3 of this Agreement), whether such engagement shall be as an employer, officer, director, owner, employee, partner or other participant in any Competitive Business, (ii) assist others in engaging in any Competitive Business in the manner described in the foregoing Clause (i), or (iii) induce others to terminate their relationship with the Company or engage in any Competitive Business. As used in this

Section V of this Agreement, the term "Competitive Business" shall mean and include any business with any investor, prospective investor, client or business prospect of the Company or any fund to which the Company provides services who was a investor, prospective investor, client or business prospect of the Company or any fund to which the Company provides services at any time during the term of this Agreement, which directly or indirectly competes with the business presently conducted by the Company on the date of this Agreement or as shall be conducted by the Company at any time during the period in which the Restricted Party is a Restricted Party of the Company, including, but not limited to, any business involving private equity secondary management and services.

      5.4     **Non-Solicitation**. No Restricted Party shall, from and after the date of this Agreement and for a period of two (2) years following the complete termination of a Restricted Party's interest in the Company, either personally or through any individual, association, partnership, corporation or other entity, solicit or induce, or attempt to solicit or induce, in any manner whatsoever (i) any past, present or prospective customer of the Company from doing business with the Company, (ii) any person to refrain from referring any customer to the Company, or (iii) any employee or independent contractor of the Company to terminate their relationship with the Company.

      5.5     **Reasonableness of Restrictions**. The Restricted Partys have carefully read and considered the provisions of Subsections 5.2, 5.3 and 5.4 of this Agreement, and having done so, agree that the restrictions set forth in Subsections 5.2, 5.3 and 5.4 of this Agreement, including, but not limited to, the time period of the restrictions and, geographic areas of the restrictions, are fair and reasonable, are reasonably required in order to protect, maintain and preserve the value and goodwill of the business of the Company, as well as the proprietary, confidential and other legitimate business interests of the Company, and that any violations of them would cause substantial and irreparable harm to the Company. The Company acknowledges and agrees that the provisions of Subsections 5.2, 5.3 and 5.4 of this Agreement are a material inducement for the Company signing this Agreement.

      5.6     **Enforcement**. It is the desire and intent of the parties hereto that the provisions of this Agreement shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, if any of the provisions of Subsections 5.2, 5.3 and 5.4 of this Agreement shall be held to be invalid or unenforceable, the remaining provisions thereof shall nevertheless continue to be valid and enforceable as though the invalid or unenforceable parts had not been included therein. In the event that any provisions of Subsections 5.2, 5.3 and 5.4 of this Agreement relating to the time period and/or the geographical areas of restrictions and/or related aspects shall be declared by a court of competent jurisdiction to exceed the maximum restrictiveness such court deems reasonable and enforceable, the time period and/or geographic areas of restriction and/or related aspects deemed reasonable and enforceable by the court shall become and thereafter be the maximum restrictions in such regard, and restrictions shall remain enforceable to the fullest extent deemed reasonable by such court.

      5.7     **Remedies for Breach of Covenants of Non-Disclosure and Non-Competition**. In the event of a breach or threatened breach of any of the provisions in

Subsections 5.2, 5.3 and 5.4 of this Agreement, the Company shall have the right to seek monetary damages for any past breach and equitable relief, including specific performance by means of an injunction (without posting a bond), against the Restricted Party or against the Restricted Party's partners, agents, representatives, servants, employers, employees and/or any and all persons acting, directly or indirectly, by or with the Restricted Party, to prevent or restrain any further breach, without the necessity of showing any actual damages or that money damages would not afford an adequate remedy. The Restricted Party agrees to pay to the Company all of the Company's reasonable attorneys' fees and costs incurred by the Company to enforce the provisions of this Agreement. Nothing contained in this Agreement shall be construed as prohibiting the Company from pursuing any other remedies available for such breach or threatened breach of this Agreement.

     5.8     **Termination of Covenants**. Notwithstanding any contained in Subsections 5.2, 5.3 and 5.4 of this Agreement to the contrary, in the event of the voluntary dissolution of the Company as provided in Subsection 11.2(a) of this Agreement on or before the second anniversary of the Effective Date, the provisions of Subsections 5.2, 5.3 and 5.4 of this Agreement shall terminate as of the date of dissolution of the Company.

## VI. TAX, FINANCIAL AND ACCOUNTING MATTERS

     6.1     **Fiscal Year and Accounting Method**. The fiscal year of the Company for both accounting and income tax purposes shall be the calendar year, and for both accounting and income tax purposes the Company shall report its operations and profits and losses in accordance with the cash method of accounting, unless a different method of accounting is required by applicable federal tax laws.

     6.2     **Annual Tax Return**. The accountant for the Company shall prepare all required tax returns for the Company as of the end of each fiscal year, and a statement of each Member's distributive share of the items of income, gain, loss, deduction and credit of the Company for tax purposes for such fiscal year. The Company shall furnish each Member with a copy of each such tax return and statement within thirty (30) days after the Company files its tax returns for such fiscal year.

     6.3     **Tax and Accounting Matters**. All elections with respect to the preparation and filing of the Company tax returns, the reporting of items of Company income, gain, loss, deduction and credit, and all other elections which the Company or Members are entitled to make with respect to Company matters, shall be made only by the Company. Pilson shall be the Tax Matters Partner for the Company for income tax purposes. All decisions as to accounting matters shall be made in accordance with the cash method of accounting applied on a basis consistent with prior periods, unless a different method of accounting is required by applicable federal tax laws.

     6.4     **Books and Records**. The Company shall maintain a full and accurate set of books and records at its principal place of business. Each Member and his duly authorized representative shall have access to and may inspect and copy any such books and records at all reasonable times.

6.5     **Bank Account**. The Company shall open and maintain a bank account or bank accounts in the name of the Company at such bank or banks as approved by the Managers. All funds of the Company not otherwise invested shall be deposited in and withdrawn from such bank account(s) as approved by the Managers. Any withdrawals from such bank account(s) shall require such signature or signatures as approved by the Managers from time to time.

6.6     **Annual Budget**. The Managers shall annually cause to be prepared and distributed to the Members an operating budget setting forth an estimate of the operating expenses expected to be incurred by the Company and an estimate of the revenues to be derived by the Company for such fiscal year. Such budget shall specify the anticipated sources of revenues and anticipated operating expenses, capital expenditures, reserves and other information, in reasonable detail.

## VII. MEMBERS

7.1     **Management Authority of Members**. The Members, as such, shall take no part in, or interfere in any manner with, the management, conduct or control of the Company's business, or the purchase, sale, financing, or distribution of Company Property. The Members shall have no right or authority to act for, control or bind the Company, except as otherwise expressly provided for in this Agreement.

7.2     **Liability of Members**. No Member shall have any personal liability for the liabilities or obligations of the Company, except to the extent of the capital contributions made by such Member to the Company in accordance with the terms of this Agreement. The Managers shall not be personally liable to the Members for the return of their capital contributions to the Company or for any capital contributions lost by the Members.

7.3     **Power of Attorney**. Each of the Members irrevocably constitutes and appoints each Manager his true and lawful attorney, in his name, place and stead, to make, execute, acknowledge, deliver and record the following:

(a)     Any certificate or other instrument which may be required by any governmental authority, or which the Managers may deem necessary or appropriate for purposes of the Company, including, but not limited to, the Certificate and any amendments or modifications thereto.

(b)     All instruments which the Managers deem necessary or appropriate to implement any amendment, change or modification of the Company in accordance with the terms of this Agreement.

(c)     All documents which the Managers deem necessary or appropriate to effectuate the dissolution and winding up of the Company.

(d)     All such other instruments, documents and certificates which may, from time to time, be required by the laws of the United States of America or any jurisdiction (or any political subdivision or agency thereof) in which the Company shall do business to effectuate,

implement, continue and defend the valid and subsisting existence of the Company as a limited liability company.

Each of the Members understands and intends that the grant of the foregoing power of attorney is coupled with an interest. The foregoing power of attorney will survive the transfer by any Member of the whole or any portion of his Company interest, except that where a transferee of such interest has been admitted by the Managers as a Member, then the foregoing power of attorney from the transferor Member shall survive such transfer for the sole purpose of enabling the Managers to execute, acknowledge and file any and all instruments necessary to effectuate such transfer, and shall extend to each Member's heirs, executors, administrators, personal representatives, successors and assigns. Each Member agrees to be bound by any representation made by the Managers, acting in good faith pursuant to such power of attorney, and each Member waives any and all defenses which may be available to contest, negate or disaffirm the action of the Managers taken in good faith under such power of attorney.

7.4 **Vote of the Members**.

(a) Majority Vote. Unless specified otherwise in this Agreement, a majority consent of the Members as determined based on the Company interest owned by the Members with respect to any item of business shall be the act and decision of the Members and the phrase "approved by the Members" as used in this Agreement shall mean such a decision and only such a decision.

(b) Super-Majority Vote. A super-majority consent of the Members shall mean the consent of more than eighty percent (80%) of the Members as determined based on the Company interest owned by the Members.

## VIII. MANAGERS

8.1 **Management Authority of Managers**. The Managers shall have the full and exclusive responsibility for the management of the Company, the operation of the business of the Company, and the performance of the duties described in this Section VIII of this Agreement.

8.2 **Duties of Loyalty and Care of Managers**. The Managers shall devote such time to the operations of the Company as they, in their sole discretion, deem to be reasonably required to conduct the Company business and to operate and manage the Company Property in an efficient manner. The Managers shall use commercially reasonable efforts to manage the business and affairs of the Company. The doing of any act or failure to do any act which may result in a loss to the Company, if done in good faith and in a manner reasonably believed to be in the best interest of the Company, shall not subject the Managers to any liability to the Members or the Company.

8.3 **General Powers of the Managers**. The Managers shall collectively, but not severally, have all of the powers of the Company and may exercise all of the rights and powers of a manager under the Act. Unless otherwise specified in this Agreement, a majority vote in number of the Managers with respect to any item of business shall be the act and decision of the

Company; and the phrase "approved by the Managers" as used in this Agreement shall mean such a decision and only such a decision. No Manager shall have the right, privilege or power to perform any act on behalf of the Company, unless such act has been approved by the Managers. In the event there is a deadlock among the Managers over the conduct or management of the Company business or Company Property, such deadlock shall be decided by a vote of all of the Managers who are Members by Company interest, and the decision of such Managers owning a majority of the Company interest, as represented by the number of Units owned by those Managers shall be binding on the Company.

        8.4    **Specific Powers of the Managers**. Subject to the terms of this Agreement, the Managers shall have and possess the same powers and rights as any manager and/or member of a limited liability company under the Act, including, but not limited to, the power and right to:

        (a)    Manage the Company Property, and enter into contracts with respect to such management, in whole or in part, by related or unrelated third parties.

        (b)    Execute such documents, certificates or instruments as they may deem necessary or appropriate for the Company's purpose.

        (c)    Sell, assign, convey, lease, mortgage or otherwise dispose of or deal with all or any part of the Company Property, including, but not limited to, the power and right to utilize all or any part of the Company Property as collateral for any indebtedness.

        (d)    Perform or cause to be performed all of the Company obligations under any agreement to which the Company is a party or by which it is bound.

        (e)    Acquire property from any person, or employ or deal with any person. The fact that a Member is employed by or is directly or indirectly interested in, affiliated or connected with any such person, shall not prohibit the Managers or the Company from employing or otherwise dealing with such person.

        (f)    Adjust, compromise, settle or refer to arbitration any claim against or in favor of the Company and to institute, prosecute or defend any legal proceedings relating to the Company's business and/or the Company Property.

        (g)    Enter into agreements with or employ such accountants and attorneys and contract for such other professional services as may be necessary and appropriate for the conduct of the Company's business.

        (h)    Do any and all of the foregoing upon such terms and conditions as they may deem proper, and to execute, acknowledge and deliver any and all instruments, certificates or documents in connection with any or all of the foregoing and to take such further action as they may deem necessary or appropriate in connection with the management and business of the Company.

8.5 **Limitations on Managers' Authority**.  Unless approved by a super-majority consent of the Members, the Managers shall not have the authority to:

(a)     Amend the Certificate of Formation of the Company;

(b)     Merge, consolidate, convert, or otherwise reorganize the Company with or into another entity, redomesticate, or otherwise change the state or other jurisdiction where the Company is organized;

(c)     Change the strategic direction of the Company;

(d)     Increase the compensation of any Manager or any person related to or affiliated with any Manager in excess of standard market practices;

(e)     Enter into any transaction, or bind or obligate the Company with respect to any agreement with any person related to or affiliated with any Manager;

(f)     Enter into any transaction, or bind or obligate the Company with respect to any agreement (or series of related agreements), that involves the acquisition of capital assets with a cost to the Company of more than One Hundred Fifty Thousand Dollars ($150,000.00) (a "Material Transaction"), or agree on behalf of the Company to any material amendment, modification, alteration, waiver, or adjustment with respect to any Material Transaction to which the Company is a party or beneficiary;

(g)     Borrow money or otherwise incur any indebtedness on behalf of the Company; or

(h)     Enter into an agreement of sale or grant any option, conversion right, right of first offer or refusal, or similar right to any person to purchase all or substantially all of the assets of the Company.

8.6 **Compensation for Managers**.  The Managers shall each be entitled to reasonable, market based compensation for personal services rendered by them on behalf of the Company in their capacity as Managers, which compensation shall not be dependent on the Company's profits and losses.  For purposes of this Subsection, reimbursement for out-of-pocket expenses shall not be construed as "compensation".  The Managers shall be fully reimbursed by the Company for all out-of-pocket expenses incurred by them on behalf of the Company.

8.7 **Indemnification of Members and Managers**.  The Company shall appear, defend and indemnify each Member and Manager from any and all claims, losses, expenses, costs, fines, penalties, judgments or damages, including reasonable attorneys' fees, which that Member or Manager, as the case may be, may incur by reason of any acts or a failure to act with respect to the Company or in furtherance of its interest, if done in good faith and in a manner reasonably believed to be in the best interest of the Company.

8.8     **Selection of Managers**.  The initial Manager of the Company shall be Pilson (the "Initial Manager").  The Manager(s) may elect one (1) or more additional Managers.  At the death, resignation or removal of the last surviving Manager, the Members shall elect a new Manager(s) by an affirmative vote of the Members owning more than fifty percent (50%) of the Company interest as represented by the number of Units owned by the Members.  Upon election, the new Manager(s) shall have such rights, powers and duties as provided for by this Agreement.  In the event the Members do not elect a new Manager(s), then the management of the Company shall be with the Members and a majority vote of the Members as represented by the number of Units owned by the Members shall be the act and decision of the Company.

8.9     **Resignation and Removal of Manager**.  A Manager may resign as a manager of the Company at any time by giving at least ninety (90) days prior written notice to all of the other Managers and the Members.  A Manager may not be removed, except (a) by a super-majority consent of the Members for acts of gross negligence or fraud in connection with the performance of the Manager's duties under this Agreement or (b) as approved by the Managers.

8.10    **Officers**.

(a)     Appointment, Revocation and Removal.  The Managers may, from time to time as they deem advisable, appoint officers of the Company (the "Officers") and assign in writing titles (including, without limitation, Principal, President, Vice President, Assistant Vice President, Secretary, and Treasurer) to any such person, who shall exercise such powers and perform such duties as shall be determined from time to time by the Managers.  Unless the Managers decide otherwise, if the title is one commonly used for officers of a corporation formed under the General Corporation Law of the State of Delaware, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office.  Any delegation pursuant to this Subsection 8.10 may be revoked in writing at any time by the Managers.  An Officer may be removed with or without cause by the Managers.

(b)     Signing Authority.  Any document or instrument purporting to bind the Company shall be effective to bind the Company when executed by (i) any Manager or (ii) an officer of the Company expressly authorized to execute such document or instrument by the terms of this Agreement or the written resolution of the Managers.

## IX. ADMISSION AND RESIGNATION OF MEMBERS

9.1     **Initial Members**.  All persons having executed this Agreement as Members shall be admitted as Members without any further act on the part of the Company or the other Members.

9.2     **Additional Members**.  Following the execution of this Agreement by the initial Members, persons acquiring a Company interest directly from the Company (whether the Company interests are being issued for the first time or being reissued as a result of a reacquisition by the Company) shall not be admitted as Members of the Company, except upon the written super-majority consent of the Members.  Any Member may withhold such consent for any reason or for no reason.

9.3     **Successor Members**.  Any persons acquiring a Company interest by transfer from an existing Member shall not be admitted as a Member of the Company, except upon the written super-majority consent of the Members.  Any Member may withhold such consent for any reason or for no reason.  Notwithstanding anything contained in this Subsection 9.3 to the contrary, a permitted transferee under Subsection 10.8 of this Agreement shall be admitted as a Member of the Company without any further act or consent on the part of the Company or the Members, provided that the transferee complies with the provisions of Subsection 9.4 of this Agreement.

9.4     **Preconditions to Admission**.  In no event shall a Member consent to the admission of any person as a Member of the Company, unless and until such person agrees in writing to be bound by all of the terms of this Agreement, as then amended, and such other instruments as may be required by the Act or which the Managers deem necessary or appropriate to confirm and record such person's undertaking to be bound by the terms of this Agreement.

9.5     **Assignee of a Member**.  If a person acquiring a Company interest is not admitted as a Member of the Company as provided in this Section IX of this Agreement, then such person's interest in the Company shall be solely that of a rightful assignee of a Member as provided in the Act.

9.6     **Resignation of Members**.  No Member shall resign from the Company prior to the dissolution and winding up of the Company, except upon the unanimous written consent of the Members.  Any Member may withhold such consent for any reason or for no reason.  Any resigning Member transferring his Company interest in conformity with the transfer provisions of Section X of this Agreement, whether to the Company, an existing Member or to a third party, shall be deemed to have resigned from the Company without violating this Agreement upon and to the extent of the transfer, whether or not the transferee is admitted as a Member of the Company, and shall be entitled to payment for all amounts due to such Member under this Agreement in the same manner as provided for in Section X of this Agreement.

9.7     **Payments to Wrongfully Resigning Member**.  In the event that a Member resigns from the Company in violation of the provisions of this Agreement, any amounts due to that Member under this Agreement, subject to offset for any damages caused to the Company as a result of such wrongful resignation, shall be paid to that Member in the same manner as provided in Section X of this Agreement, but only if and when such amounts can be paid without causing the Company's liabilities, including liabilities owed to Members other than the resigning Member, to exceed the value of the Company's assets and without causing the Company to be unable to meet its current debts and obligations as they come due after allowing for a reasonable reserve for capital needs and improvements, the acquisition of additional Company Property or for any other contingency of the Company.

## X. TRANSFER OF COMPANY INTERESTS

10.1     **Restrictions on Transfer by Members**.  Each Member, fully realizing the restrictions that he is placing upon the free transfer of his Company interest, agrees not to transfer (as hereinafter defined in this Subsection X of this Agreement) any Company interest, now

owned or hereafter acquired by him, unless he obtains the prior written consent of all the parties to this Agreement or complies with the applicable provisions of this Agreement. In the event that a Member transfers any of the Company interest without obtaining the prior written consent of all of the parties to this Agreement or in violation of any of the applicable provisions of this Agreement, such transfer shall be null and void ab initio and of no force or effect. For purposes of this Agreement, "transfer" shall mean any sale, assignment, pledge, hypothecation, creation of any encumbrance or security interest, gift, bequest, inheritance or other disposition, whether voluntary or involuntary, whether for value or gratuitous, by operation of law or otherwise, including, but not limited to, all executions of legal process, bankruptcy, or assignment for the benefit of creditors. A "transfer" shall also include any transaction the intended result of which is to avoid the restrictions of this Agreement, including by merger, consolidation, separation or reorganization.

10.2    **Voluntary Transfers**.

(a)    <u>Offer to Sell to the Company</u>. If a Member proposes to transfer any of his Company interest (the "Selling Member"), he shall give written notice to the Company (the "Offering Notice"), stating his desire to dispose of some or all of his Company interest (the "Offered Company Interest") and shall offer the Offered Company Interest for sale to the Company.

(b)    <u>Acceptance of Offer by the Company</u>. The Company shall have the option to purchase any or all of the Offered Company Interest for a period of sixty (60) days following receipt of the Offering Notice, at the price and under the terms determined in the manner set forth in Paragraph 10.2(f) of this Agreement. On or before the expiration of the aforesaid sixty (60) day period, the Company shall deliver written notice to the Selling Member of its decision whether or not to exercise this option.

(c)    <u>Offer to Sell to the Other Members</u>. If the Company either (i) fails to properly exercise its option as provided in Paragraph 10.2(b) of this Agreement or (ii) properly exercises its option as provided in Paragraph 10.2(b) of this Agreement, but elects to purchase less than all of the Offered Company Interest, then the Selling Member shall offer to sell the remaining Offered Company Interest to the Members other than the Selling Member (the "Other Members") by delivering to them a copy of the Offering Notice within thirty (30) days immediately following the expiration of the option period as provided in Paragraph 10.2(b) of this Agreement.

(d)    <u>Acceptance of Offer by the Other Members</u>. The Other Members shall have the option to purchase the remaining Offered Company Interest for a period of sixty (60) days following receipt of the Offering Notice, at the price and under the terms determined in the manner set forth in Paragraph 10.2(f) of this Agreement. On or before the expiration of the aforesaid sixty (60) day period, the Other Members shall deliver written notice to the Selling Member of their decision whether or not to exercise this option.

(e)    <u>Pro Rata Exercise by the Other Members</u>. Each of the Other Members shall have the right to purchase such portion of the remaining Offered Company Interest as the

number of Company Units owned by such Other Member bears to the total number of Company Units owned by all of the Other Members. If any of the Other Members fail to properly exercise their option as provided in Paragraph 10.2(d) of this Agreement, then the balance of the remaining Offered Company Interest may be purchased by the remaining Other Members equally or in such other manner as they may agree among themselves.

(f)     Purchase Price and Payment Terms.  The exercise of the option to purchase the Offered Company Interest by the Company and/or the Other Members (the "Purchaser") under Paragraphs 10.2(b) and/or 10.2(d) of this Agreement shall be at the purchase price and under the terms set forth in Subsection 10.6 of this Agreement.

(g)     Closing.  A closing for the purchase of the Offered Company Interest by the Purchaser as provided in this Subsection 10.2 of this Agreement shall be held no later than one hundred eighty (180) days after the receipt by the Company of the Offering Notice from the Selling Member pursuant to Paragraph 10.2(a) of this Agreement. Notwithstanding anything contained in this Subsection 10.2 of this Agreement to the contrary, the Selling Member shall not be obligated to sell any of the Offered Company Interest to the Purchaser, unless the Purchaser properly exercises their option to purchase all (but not less than all) of the Offered Company Interest.

(h)     Right of First Refusal.  In the event that the Purchaser does not elect to purchase all of the Offered Company Interest as provided in this Subsection 10.2 of this Agreement, the Selling Member may, during the ninety (90) day period thereafter, solicit offers from any other person (the "Third Party") to purchase the Offered Company Interest, subject to the Purchaser's right of first refusal as set forth herein. No offer to sell the Offered Company Interest shall be valid unless it is (i) bona fide, (ii) in writing, (iii) contains all of the terms and conditions that are material to the offer, and (iv) is signed by the Third Party and the Selling Member (the "Third Party Offer"). In the event the Selling Member obtains a Third Party Offer to purchase the Offered Company Interest, the Selling Member shall deliver the Third Party Offer to the Company within ten (10) days after receipt thereof and shall reoffer the Offered Company Interest to the Company on the same terms and conditions as contained in the Third Party Offer. In the event the Company accepts, in writing, the Selling Member's offer to purchase the Offered Company Interest in accordance with the terms and conditions contained in the Third Party Offer within twenty (20) days after receipt of the Third Party Offer, the closing on the purchase of the Offered Company Interest shall be held in accordance with the terms and conditions of the Third Party Offer. In the event the Company does not accept the Selling Member's offer to purchase the Offered Company Interest in accordance with the terms and conditions of the Third Party Offer within twenty (20) days after receipt of the Third Party Offer, the Selling Member shall be free to sell the Offered Company Interest to the Third Party, but only in accordance with the exact same terms and conditions set forth in the Third Party Offer. In the event the aforesaid ninety (90) day period expires or any of the terms or conditions of the Third Party Offer are changed either by the Selling Member and/or the Third Party, the Offered Company Interest shall again become subject to all of the transfer restrictions set forth in this Subsection 10.2 of this Agreement.

10.3     **Death of a Member**.

          (a)     <u>Offer to Sell to the Company</u>. If a Member dies (the "Deceased Member"), the legal representative of the Deceased Member's estate (the "Representative") shall first offer to sell all (but not less than all) of the Company interest owned by the Deceased Member at the time of his death or thereafter acquired by his estate (the "Offered Company Interest") to the Company by delivering written notice to the Company within ninety (90) days of the date of the Deceased Member's death (the "Offering Notice").

          (b)     <u>Acceptance of Offer by the Company</u>. The Company shall have the option to purchase any or all of the Offered Company Interest for a period of sixty (60) days following the receipt of the Offering Notice, at the price and under the terms determined in the manner set forth in Subsection 10.6 of this Agreement. On or before the expiration of the aforesaid sixty (60) day period, the Company shall deliver written notice to the Representative of its decision whether or not to exercise this option.

          (c)     <u>Offer to Sell to the Other Members</u>. If the Company either (i) fails to properly exercise its option as provided in Paragraph 10.3(b) of this Agreement or (ii) properly exercises its option as provided in Paragraph 10.3(b) of this Agreement, but elects to purchase less than all of the Offered Company Interest, then the Representative shall offer to sell the remaining Offered Company Interest to the Members other than the Deceased Member (the "Other Members") by delivering to them a copy of the Offering Notice within thirty (30) days immediately following the expiration of the option period as provided in Paragraph 10.3(b) of this Agreement.

          (d)     <u>Mandatory Acceptance by the Other Members</u>. The Other Members shall have the option to purchase and shall be required to purchase all of the remaining Offered Company Interest, at the price and under the terms determined in the manner set forth in Subsection 10.6 of this Agreement. Unless the Other Members agree otherwise among themselves, each of the Other Members shall have the right to purchase and shall be required to purchase such portion of the remaining Offered Company Interest as the number of Company Units owned by such Other Member bears to the total number of Company Units owned by all of the Other Members.

          (e)     <u>Closing</u>. A closing for the purchase of the Offered Company Interest by the Company and/or the Other Members (the "Purchaser") as provided for in this Subsection 10.3 of this Agreement shall be held no later than one hundred eighty (180) days after the date of the Deceased Member's death. Notwithstanding anything contained in this Subsection 10.3 of this Agreement to the contrary, the Representative shall not be obligated to sell any of the Offered Company Interest to the Purchaser, unless the Purchaser properly exercises their option to purchase all (but not less than all) of the Offered Company Interest.

10.4    **Disability of a Member**.

(a)    Offer to Sell to the Company. If a Member who is an employee of the Company becomes permanently disabled (the "Disabled Member") as defined in Paragraph 10.4(f) of this Agreement, the Disabled Member shall first offer to sell all (but not less than all) of the Company interest owned by the Disabled Member at the time of his permanent disability (the "Offered Company Interest") to the Company, by delivering written notice to the Company within ninety (90) days of the date of the Disabled Member's permanent disability (the "Offering Notice").

(b)    Acceptance of Offer by the Company. The Company shall have the option to purchase any or all of the Offered Company Interest for a period of sixty (60) days following the receipt of the Offering Notice, at the price and under the terms determined in the manner set forth in Subsection 10.6 of this Agreement. On or before the expiration of the aforesaid sixty (60) day period, the Company shall deliver written notice to the Disabled Member of its decision whether or not to exercise this option.

(c)    Offer to Sell to the Other Members. If the Company either (i) fails to properly exercise its option as provided in Paragraph 10.4(b) of this Agreement or (ii) properly exercises its option as provided in Paragraph 10.4(b) of this Agreement, but elects to purchase less than all of the Offered Company Interest, then the Disabled Members shall offer to sell the remaining Offered Company Interest to the Members other than the Disabled Member (the "Other Members") by delivering to them a copy of the Offering Notice within thirty (30) days immediately following the expiration of the option period as provided in Paragraph 10.4(b) of this Agreement.

(d)    Mandatory Acceptance by the Other Members. The Other Members shall have the option to purchase and shall be required to purchase all of the remaining Offered Company Interest, at the price and under the terms determined in the manner set forth in Subsection 10.6 of this Agreement. Unless the Other Members agree otherwise among themselves, each of the Other Members shall have the right to purchase and shall be required to purchase such portion of the remaining Offered Company Interest as the number of Company Units owned by such Other Member bears to the total number of Company Units owned by all of the Other Members.

(e)    Closing. A closing for the purchase of the Offered Company Interest by the Company and/or the Other Members (the "Purchaser") as provided for in this Subsection 10.4 of this Agreement shall be held no later than one hundred eighty (180) days after the date of the Disabled Member's permanent disability. Notwithstanding anything contained in this Subsection 10.4 of this Agreement to the contrary, the Disabled Member shall not be obligated to sell any of the Offered Company Interest to the Purchaser, unless the Purchaser properly exercises their option to purchase all (but not less than all) of the Offered Company Interest.

(f)    Definition of Permanent Disability. For purposes of this Agreement, the definition of "permanent disability" shall mean that a Member-employee becomes incapacitated by reason of sickness, accident or other physical or mental disability and can no longer perform

his usual and customary duties as an employee of the Company immediately prior to becoming permanently disabled. Notwithstanding the aforesaid, if a Member-employee is insured under a disability insurance policy owned by the Company or any Member, then the term "permanent disability" shall have the same meaning as contained in the disability insurance policy for permanent or total disability or any other long term disability which requires payment under such policy. In determining permanent disability, the Member-employee seeking a finding of permanent disability shall submit to an examination by a physician if requested, in writing, by the Other Members within fifteen (15) days of the date of the Offering Notice. The determination of permanent disability shall be made by a physician selected by the Member-employee seeking a finding of permanent disability. The aforesaid examination shall be performed within thirty (30) days of the date of the Offering Notice. If the Other Members disagree, in writing, with the determination of that physician, then the Member-employee seeking a finding of permanent disability shall submit to an examination by a physician selected by the Other Members within fifteen (15) days following the receipt by the Other Members of the first physician's report. If the determination by the two (2) physicians are consistent on the issue of permanent disability, then the matter shall be deemed conclusively resolved. If the determination by the two (2) physicians are inconsistent on the issue of permanent disability, then the determination of permanent disability shall be made in accordance with the arbitration proceedings provided under Subsection 11.9 of this Agreement. The Members agree to vote their Company interest to cause the Company to pay all costs of the aforesaid examinations by the physicians. All physicians selected for purposes of conducting any of the aforesaid examinations shall be board certified specialist in the area most closely concerned with the disability.

### 10.5   **Involuntary Transfer; Right to Call Company Interest**.

(a)   Event of Transfer. For purposes of this Subsection 10.5 of this Agreement, the following events shall constitute an "Involuntary Transfer":

(i) if a Member's Company interest becomes subject to disposition by a final order of a court of competent jurisdiction in a proceeding for divorce or annulment or disposition by a separation agreement entered into by the Member;

(ii) if a Member's Company interest becomes subject to transfer by operation of law (e.g., to a Member's trustee in bankruptcy, to a purchaser at any creditor's or sheriff's sale involving a Member, or to a guardian of an incompetent Member); or

(iii) if a Member who is an employee of the Company has his employment with the Company terminated for any reason whatsoever (except for death or permanent disability as provided in this Agreement), regardless of whether the termination of employment is by the Member or the Company, or is with or without cause.

(b)   Right of Company to Call Company Interest. Upon the occurrence of an Involuntary Transfer with regard to a Member (the "Transferring Member"), the Company shall have the right and option to require the Transferring Member to sell to the Company any or all of the Transferring Member's Company interest (the "Offered Company Interest") for a period of ninety (90) days immediately following the occurrence of the Involuntary Transfer, at the price

and under the terms determined in the manner set forth in Subsection 10.6 of this Agreement. On or before the expiration of the aforesaid ninety (90) day period, the Company shall deliver written notice to the Transferring Member of its decision whether or not to exercise this option.

(c)     Right of Other Members to Call Company Interest. If the Company either (i) fails to properly exercise its option as provided in Paragraph 10.5(b) of this Agreement or (ii) properly exercise its option as provided in Paragraph 10.5(b) of this Agreement, but elects to purchase less than all of the Offered Company Interest, then the Members other than the Transferring Member (the "Other Members") shall have the right and option to require the Transferring Member to sell to the Other Members the remaining Offered Company Interest for a period of ninety (90) days immediately following the expiration of the Company's option provided in Paragraph 10.5(b) of this Agreement, at the price and under the terms determined in the manner set forth in Subsection 10.6 of this Agreement. On or before the expiration of the aforesaid ninety (90) day period, the Other Members shall deliver written notice to the Transferring Member of their decision whether or not to exercise this option.

(d)     Pro Rata Exercise by the Other Members. Each of the Other Members shall have the right and the option to purchase such portion of the remaining Offered Company Interest as the number of Company Units owned by such Other Member bears to the total number of Company Units owned by all of the Other Members. If any of the Other Members fail to properly exercise their option as provided in Paragraph 10.5(c) of this Agreement, then the balance of the remaining Offered Company Interest may be purchased by the remaining Other Members equally or in such other manner as they may agree among themselves.

(e)     Closing. A closing for the purchase of the Offered Company Interest by the Company and/or the Other Members (the "Purchaser") as provided in this Subsection 10.5 of this Agreement shall be held no later than one (1) year after the occurrence of the Involuntary Transfer. Notwithstanding anything contained in this Subsection 10.5 of this Agreement to the contrary, the Transferring Member shall not be obligated to sell any of the Offered Company Interest unless, the Purchaser properly exercises its option to purchase all (but not less than all) of the Offered Company Interest.

10.6     **Purchase Price; Payment Terms**.

(a)     Unit Value. For purposes of this Agreement, the value of each of the Company Units (the "Unit Value") shall be the value set forth in the Valuation Addendum, attached hereto and incorporated herein as Exhibit "A", as of the date the Event of Transfer (as hereinafter defined in this Paragraph 10.6(a) of this Agreement) occurs; provided that (i) the delivery of the Offering Notice as provided in Subsection 10.2 of this Agreement, (ii) the Deceased Member's death as provided in Subsection 10.3 of this Agreement, (iii) the Disabled Member's permanent disability as provided in Subsection 10.4 of this Agreement or (iv) the Involuntary Transfer as provided in Section 10.5 of this Agreement, as the case may be (the "Event of Transfer"), occurs within the one (1) year period immediately following the date of the latest Valuation Addendum to this Agreement. Members owning at least eighty percent (80%) of the voting Company interest shall have the right to determine the value of the Company interest for the purposes of the Valuation Addendum at any time, and from time to time, prior to the

occurrence of an Event of Transfer, by inserting the Unit Value where indicated on the Valuation Addendum and indicating their assent thereto by initialing the Company interest Value where indicated on the Valuation Addendum. If the Event of Transfer occurs more than one (1) year after the date of the latest Valuation Addendum, then the Unit Value shall be determined as of the last day of the calendar month immediately proceeding the Event of Transfer by the Company's certified public accountant, in accordance with generally accepted accounting principles, applied on a basis consistent with prior periods, in accordance with the following formula: Three and 5/10 (3.5) times assets under management times the percentage management fees attributable to those assets.

        (b)    Purchase Price.

        (i)    Third Party Offer. The price at which the Purchaser shall purchase a Member's Company interest in the event of a Third Party Offer if the Purchaser exercises its option to effectuate a purchase as provided for in Paragraph 10.2(h) of this Agreement, shall be such price and under such terms as provided for in Paragraph 10.2(h) of this Agreement.

        (ii)    Capital Call Default. The price at which the Purchaser shall purchase a Member's Company interest in the event of a Defaulting Member's failure to make an Additional Capital Contribution (a "Capital Call Default") shall be equal to the Unit Value determined in accordance with Paragraph 10.6(a) of this Agreement multiplied by the number of Company Units to be purchased, less an amount equal to the Capital Call Default.

        (iii)    Other Events. The price at which the Purchaser shall purchase a Member's Company interest in cases other than a Third Party Offer or a Capital Call Default shall be equal to the Unit Value determined in accordance with Paragraph 10.6(a) of this Agreement multiplied by the number of Company Units to be purchased.

        (iv)    Life Insurance Proceeds. Notwithstanding anything contained in this Agreement to the contrary, in the event of a Member's death, the purchase price shall in no event be less than one hundred percent (100%) of the amount of the insurance proceeds collected or borrowed by the Purchaser as provided in Paragraph 10.6(b) of this Agreement.

        (c)    Payment Terms. The purchase price determined in accordance with Paragraph 10.6(b) of this Agreement shall be paid at the closing by the Purchaser to the Selling Member, the Representative, the Disabled Member or the Transferring Member, as the case may be, as follows:

        (i) Cash Payment. Ten percent (10%) of the purchase price shall be paid in cash, by attorneys' check or by certified check at the closing.

        (ii) Promissory Note. The balance of the purchase price shall be paid in the form of a Promissory Note for said sum, to be amortized with equal payments of principal and interest over a term of three (3) years (five (5) years in the case of a Capital Call Default). The first payment on the Promissory Note shall be made on the first day of the second month immediately following the closing, and payments of principal and interest shall continue on the

first day of each month thereafter for an additional thirty-five (35) months (fifty-nine (59) months in the case of a Capital Call Default), when the entire unpaid balance of principal, together with all accrued and unpaid interest thereon, shall be fully due and payable. The interest to be paid on such Promissory Note shall be fixed at the lowest simple interest rate specified under Section 483 (or any successor sections) of the Code required to be charged in order to avoid the imposition of "unstated interest".

(iii) <u>Additional Terms of Promissory Note.</u> The Promissory Note shall also include the following provisions:

(A)   A provision for the Confession of Judgment against the Purchaser if the Purchaser is in default in making any payment due under the Promissory Note for a period of thirty (30) days;

(B)   A provision requiring the payment of the entire unpaid balance due under the Promissory Note in the event there is a sale or exchange of substantially all of the Company's assets or more than fifty percent (50%) of the Other Members' ownership interest in the Company;

(C)   A provision requiring the payment of a five percent (5%) late penalty for any payment more than fifteen (15) days overdue; and

(D)   A provision allowing the Purchaser to prepay the Promissory Note in whole or in part at any time, without penalty.

(iv) <u>Security for the Promissory Note.</u> To ensure the full payment and performance by the Purchaser of all of the Purchaser's obligations under the Promissory Note, the following security shall be provided at the closing:

(A)   <u>Pledge.</u> The Purchaser shall pledge all of the Offered Company Interest, granting a security interest therein to the Selling Member, the Disabled Member, the Transferring Member, or the Representative, as the case may be, until such time as the Purchaser has fully paid and performed all of the Purchaser's obligations under the Promissory Note.

(B)   <u>Mortgage and Security Interest.</u> Regardless of whether or not the Company is the Purchaser, the Company shall grant to the Selling Member, the Disabled Member, the Transferring Member, or the Representative, as the case may be, a mortgage lien against all of its real estate, if any, and a security interest against all of its assets, subordinate only to mortgage liens and security interests outstanding against such real estate and assets at the time of the purchase of the Offered Company Interest, until such time as the Purchaser has fully paid and performed all of the Purchaser's obligations under the Promissory Note.

(d)   <u>Life Insurance Applied to Purchase Price.</u> If the Purchaser of the Offered Company Interest owns life insurance insuring the life of the Deceased Member, then the proceeds of such life insurance policy(ies) shall be paid by the Purchaser to the Representative in

a lump sum to be applied toward the purchase price as provided in this Subsection 10.6 of this Agreement. Alternatively, if the owner of the life insurance policy(ies) insuring the life of the Deceased Member is a party to this Agreement, but other than the Purchaser, then the owner of such life insurance policy(ies) shall lend the proceeds from such life insurance to the Purchaser so that the Purchaser can use such proceeds to pay to the Representative in a lump sum to be applied toward the purchase price as provided in this Subsection 10.6 of this Agreement.

### 10.7   **Purchase of Life Insurance**.

(a)     The Company may purchase and be the beneficiary of insurance on the lives of its Members in an amount determined by the Company. If the Company elects to purchase insurance on the lives of its Members, the insurance coverage shall be reviewed annually and may be adjusted as the Managers of the Company deems sufficient to satisfy the Company's obligations for the purchase of the Company interest under this Agreement. Each Member agrees to cooperate to the extent necessary to enable to Company to purchase any such life insurance, including submitting to any physical examination and providing any medical information required by the insurer.

(b)     Steiner may purchase and be the beneficiary of insurance on the life of Pilson in an amount determined by Steiner, which, notwithstanding Paragraph 10.6(d) of this Agreement, shall not be applied toward the purchase price for Pilson's Shares. Pilson agrees to cooperate to the extent necessary to enable to Steiner to purchase any such life insurance, including submitting to any physical examination and providing any medical information required by the insurer.

(c)     This Subsection 10.7 of this Agreement shall not be construed to prohibit or limit the Members from purchasing life insurance on their respective lives as they deem necessary to satisfy their obligations to purchase the Company interest under this Agreement.

### 10.8   **Permitted Transfers**.

(a)     Permitted Transferees.  Notwithstanding any provisions in this Agreement to be contrary, a Member may transfer (the "Transferring Member") any or all of his Company interest (the "Transferred Company interest") to another Member, to an employee of the Company , in the case of Pilson, Barry M. Miller, or to a transferee that bears one (1) of the following relationships to the Transferring Member: a spouse, a lineal descendant or a revocable trust created for the primary benefit of the Transferring Member and/or the Transferring Member's spouse or lineal descendant(s) (the "Permitted Transferee"). The Permitted Transferee shall hold the Transferred Company interest subject to all of the provisions of this Agreement and shall make no further transfers thereof other than as permitted in this Agreement. As a condition precedent to the effectiveness of any permitted transfer contemplated by this Subsection 10.8 of this Agreement, the Permitted Transferee shall comply with the provisions of Paragraph 9.4 of this Agreement.

(b)     <u>Limitation on Transfers by Pilson</u>.  Any transfer by Pilson (other than to a revocable trust created for the primary benefit of Pilson and/or his spouse or lineal descendant(s)) that would result in Pilson's Company interest being less than fifty-one percent (51%) shall require the prior written consent of Steiner.

10.9     **Percentage of Limitations on Transfers**.  Notwithstanding any other provision of this Agreement to the contrary, the Company shall not be required to recognize any transfer of a Company interest if the transfer, when considered with other transfers of Company interests made within the period of twelve (12) consecutive calendar months prior thereto, would constitute a sale or exchange of fifty percent (50%) or more of the total Company interest and result in the tax termination of the Company under Section 708(b) of the Code.

10.10     **Costs and Expenses of Transfer**.  The Transferring Member shall pay all costs and expenses incurred by the Company in connection with any transfer of a Company interest pursuant to this Section X of this Agreement and/or another person's becoming a Member of the Company or an assignee of a Member of the Company, including, but not limited to, all filing, recording and publishing costs and reasonable attorneys' fees and disbursements.

10.11     **Action of Members**.  Any Member or any Manager who is also a Member (including for this purpose the personal representative of a Deceased Manager), whose Company interest is in whole or in part the subject of a transfer pursuant to this Agreement, shall not vote any of his Company interest on Company decisions pertaining to the transfer of his Company interest.  The sole exception to the aforesaid restriction shall be that if the validity of the Company action turns upon that Member's Company interest being present or voted, then that Member's interest will be deemed to be present and to have been voted in accordance with the majority of the other Company interests being voted.

## XI. DISSOLUTION

11.1     **Waiver**.  Each Member waives and, to the extent that a Member cannot waive, agrees not to exercise any right under the Act or any other law to dissolve the Company, except as provided in this Agreement.

11.2     **Events Causing Dissolution**.  The Company shall be dissolved upon the occurrence of the earliest of the following events:

(a)     By unanimous written consent of the Members; or

(b)     Upon the occurrence of any other event causing a dissolution of the Company under the Act or this Agreement.

11.3     **Winding Up**.  Upon the dissolution of the Company, the last remaining Member(s) or, if none, the personal representative of the last remaining Member shall conclude the business of the Company, wind up its affairs, distribute its assets in liquidation, and file all certificates or notices required by the Act to evidence such dissolution, liquidation and termination.  Except as otherwise expressly provided for in the Act, all decisions pertaining to

the dissolution of the Company shall be made in the same manner as decisions made in the ordinary course of the Company's business.

11.4 **Final Accounting; Deficit Capital Accounts**. Upon the dissolution of the Company, a final accounting shall be made of the capital account of each Member, adjusted up or down to reflect each Member's proportionate share of the Company's net profit or net loss from the time of the last previous accounting to the date of the dissolution. Except as otherwise provided in this Agreement, no Member shall have any obligation to fund or make up a deficit capital account balance.

11.5 **Priority of Distributions**. Upon the winding up of the Company, the assets shall be distributed as follows:

(a) First, to creditors of the Company, including Members and Managers who are creditors of the Company, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof) other than liabilities for which reasonable provision for payment has been made and liabilities for distributions to Members and former Members under § 18-601 or § 18-604 of the Act;

(b) Second, to Members and former Members in satisfaction of liabilities for distributions under § 18-601 or § 18-604 of the Act;

(c) Third, to Members for the return of their capital contributions, in the proportions in which the Members share in distributions of cash and property; and

(d) Fourth, to Members respecting their Company interests, in the proportions in which the Members share in distributions of cash and property.

11.6 **Payment of Claims**. Upon the dissolution of the Company, the Company (i) shall pay or make reasonable provision to pay all claims and obligations, including all contingent, conditional or unmatured contractual claims, known to the Company, (ii) shall make such provision as will be reasonably likely to be sufficient to provide compensation for any claim against the Company which is the subject of a pending action, suit or proceeding to which the Company is a party and (iii) shall make such provision as will be reasonably likely to be sufficient to provide compensation for claims that have not been made known to the Company or that have not arisen but that, based on facts known to the Company, are likely to arise or to become known to the Company within ten (10) years after the date of dissolution. If the Company has sufficient assets, such claims and obligations shall be paid in full and any such provision for payment made shall be made in full. If the Company has insufficient assets, such claims and obligations shall be paid or provided for according to their priority and, among claims of equal priority, ratably to the extent of assets available therefor. Any remaining Company assets shall be distributed as provided in Subsection 11.5 of this Agreement.

11.7 **Distributions in Kind**. No Member may demand or receive property other than cash in return for his contributions, loans or advances to the Company or upon distribution or

dissolution from the Company as provided herein; provided, however, that in the event that all of the Members at the time of dissolution so determine, it shall not be necessary to liquidate all of the Company Property; but the Company Property which shall not be required to be liquidated to satisfy the categories of distribution described in Paragraph 11.5 of this Agreement may be distributed in kind, including, but not limited to, undivided interests in such Company Property, whether or not like property is distributed to each Member.

## XII. MISCELLANEOUS

12.1    **Separability**.  The provisions of this Agreement are separate and divisible, and if any court of competent jurisdiction shall determine that any provision of this Agreement is void or unenforceable, the remaining provisions shall be construed and shall be valid as if the void or unenforceable provision or provisions were not included in this Agreement.

12.2    **Survival of Rights**.  Except as otherwise provided in this Agreement to the contrary, this Agreement shall be binding upon and inure to the benefit of the parties to this Agreement, and their respective heirs, administrators, executors, successors, personal representatives and permitted assigns.

12.3    **Entire Agreement**.  This writing represents the entire agreement and understanding of the parties with respect to the subject matter of this Agreement and supersedes all prior and contemporaneous agreements and understandings of such parties in connection with this Agreement.  Unless otherwise expressly provided in this Agreement, this Agreement may not be amended or modified except by an affirmative vote of the Members owning more than eighty percent (80%) of the Company interest as represented by the number of Units owned by the Members and all of the Managers.

12.4    **Applicable Law**.  This Agreement is a Delaware contract and shall be governed by, and construed, enforced and interpreted in accordance with, the laws of the State of Delaware, without regard to principles of conflicts of law.

12.5    **Notices**.  All notices under this Agreement shall be in writing and shall be delivered to the parties at the addresses set forth in this Subsection 12.5 of this Agreement and to the Company at its principal office, or at such other address as any of the parties may hereafter specify as provided in this Subsection 12.5 of this Agreement.  Unless delivered personally, such notices shall be sent by first class United States mail, certified or registered, postage prepaid, return receipt requested, addressed as follows:

> Nottingham Capital Management LLC
> Attn: Michael T. Pilson
> 909 Nottingham Road
> Wilmington, DE  19805
>
> Michael T. Pilson
> 909 Nottingham Road
> Wilmington, DE  19805

Michael Steiner
2315 Ridgeway Road
Wilmington, DE 19805

12.6    **Interpretation**. The section, subsection and paragraph headings are for convenience purposes only and shall in no way define, extend or interpret the scope of this Agreement or of any particular section, subsection or paragraph. When used in this Agreement, singular terms include the plural as appropriate in context, and masculine terms include the feminine and neuter genders as appropriate in context.

12.7    **Waiver**. No course of dealing by any party to this Agreement, nor any delay or failure on the part of any party to exercise any right under this Agreement, shall operate as a waiver of such right or otherwise prejudice such party's rights, powers and remedies, nor shall any waiver of one (1) breach of this Agreement be construed as a waiver of any rights or remedies with respect to any subsequent breach.

12.8    **Agreement in Counterparts**. This Agreement may be executed in several counterparts and, as executed, shall constitute one (1) Agreement, binding on all the parties to this Agreement, notwithstanding that all the parties are not signatory to the original or the same counterpart.

12.9    **Arbitration**. Any dispute, claim, controversy arising out of or in connection with or relating to this Agreement or any breach or alleged breach of this Agreement, including, but not limited to, a deadlock among the Members, shall, upon the request of any party involved, be submitted to and settled by three (3) arbitrators in Wilmington, Delaware, pursuant to the Commercial Arbitration Rules of the American Arbitration Association. The decision of the arbitrators shall be final and binding. Judgment may be entered in any court of record in the State of Delaware upon the decision of the arbitrators. The cost of the arbitration shall be shared equally by the parties to the arbitration. Each of the parties shall pay their own attorneys' fees incurred in connection with the arbitration.

12.10    **Enforceability**. If any part of this Agreement is found to be invalid, illegal or unenforceable under present or future laws effective at any time during the term of this Agreement, and it is the intention of the parties to this Agreement that the remainder of this Agreement shall not be affected thereby, then there shall be added as part of this Agreement a provision or provisions as similar in terms to such invalid, illegal or unenforceable part of this Agreement as may be possible and be valid, legal and enforceable.

12.11    **Time is of the Essence**. Time is of the essence in this Agreement.

12.12    **Tax Status**. The parties to this Agreement intend that the Company shall be classified as a partnership for federal, state and local income tax purposes and the parties agree that the provisions of this Agreement shall be construed and applied in a manner that will not impair the qualification of the Company as a partnership under the applicable provisions of the Code, or the laws of any other state or local tax authorities, and the parties further agree that insofar as any provisions of this Agreement could be construed to adversely affect the

qualification of the Company as a partnership for such purposes, such provisions shall be disregarded and shall become null and void.

12.13    **Legal Representation**.  Each party to this Agreement acknowledges that this Agreement has been prepared by counsel representing the Company and that counsel has informed each party that a conflict of interest may exist between that party and one (1) or more other parties to this Agreement.  Having had the opportunity to do so, each party acknowledges that either independent counsel has been consulted by that party or that party, knowing of the potential conflict, nevertheless consents to a joint representation.

**IN WITNESS WHEREOF,** the parties to this Agreement have signed, sealed and delivered this Agreement this _____ day of January, 2010, intending this Agreement to be effective as of the Effective Date.

_____          _____(SEAL)
Witness                            Michael T. Pilson,
                                   Individually and as a
                                   Member and Manager

_____          _____(SEAL)
Witness                            Michael Steiner,
                                   Individually and as a
                                   Member